Victor **MENACHO**, Plaintiff,

v.

**ADAMSON UNITED COMPANY** et al., **Defendants.**

Civ. A. No. 74–1514.

United States District Court,
D. New Jersey.

Aug. 19, 1976.

Paul Franz (by George Kachmar, III), Elizabeth, N. J., for plaintiff.

Shanley & Fisher (by Thomas B. Leyhane), Newark, N. J., for movants-defendants.

Schwartz & Andolino (by Patrick B. Silva), Newark, N. J., for defendant Zurn Industries, Inc.

**130**

COOLAHAN, Senior District Judge.

This case comes before the Court on motion for summary judgment by defendants Adamson United Company, United Engineering & Foundry Co., and Wean United, Inc., pursuant to Fed.R.Civ.P. 56. Movants claim they cannot be held liable as a matter of law for the injuries sustained by plaintiff while cleaning a machine manufactured by movants' predecessor. Plaintiff and defendant Zurn Industries, Inc.—Div. of EEMCO[1] contend that movants are either a continuation of, or a corporation created by merger with, the corporation that manufactured the machine which caused plaintiff's injuries, and can therefore be held liable under the doctrine of successor corporations enunciated in *McKee v. Harris-Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98 (L.Div. 1972), *aff'd per curiam*, 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972), and reinterpreted in *Wilson v. Fare Well Corp.*, 140 N.J.Super. 476, 356 A.2d 458 (L.Div.1976), *leave to appeal denied* (unpublished order, Docket No. AM–599–75, July 1, 1976). This motion requires the Court to determine the effect of the recent *Wilson* opinion on prevailing New Jersey law.

The present action is one brought in this Court's diversity jurisdiction. 28 U.S.C. § 1332(a).[2] In diversity jurisdiction, a federal court is bound to apply the conflict of laws rule of the State in which it sits. *Klaxon Co. v. Stentor Electrical Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Therefore, the Court must apply New Jersey's conflict of laws rule. The New Jersey conflict rule is to apply a weighing of governmental interests test patterned after *Restatement 2d, Conflict of Laws. See, Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 305 A.2d 412 (1973); *Rose v. Port of N. Y. Authority*, 61 N.J. 129, 293 A.2d 371 (1972); *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3rd Cir. 1975). However, movants argue that New Jersey substantive law and Ohio substantive law are identical on the question before the Court so that new Jersey law may be applied. *See, McKee v. Harris-Seybold Co., supra* (where the very same States were involved in exactly the same question as now confronts the Court; there the New Jersey court applied its own substantive law).[3] The Court agrees with the parties that the substantive law of the two States is similar on this point and, therefore, will do what the New Jersey court did in the same situation and apply New Jersey substantive law.[4]

On January 3, 1973, Victor Menacho, the plaintiff, was employed as a machine operator by Continental Plastics and Chemical Co. in Avenel, New Jersey. While cleaning a plastic null machine, his hand became lodged between two rollers. When the machine was finally stopped, plaintiff had sustained severe injuries to his right hand, which resulted in the amputation of three fingers. Plaintiff claims the machine was defective and lacked adequate safeguards.

The plastic null machine was originally manufactured in May, 1920, by the Adamson Machine Co. of Ohio. (Westin affidavit, Sept. 10, 1975; Leyhane affidavit, Sept. 22,

---

1. Zurn Industries is incorrectly referred to in the caption as Erie Engine Co.

2. Plaintiff is a citizen of New Jersey and defendants are citizens of Pennsylvania and Ohio, and there is more than $10,000 in controversy. Thus, there is complete diversity in the *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), sense.

3. Counsel for plaintiff originally argued that Ohio law should apply, but later apparently conceded that New Jersey law should apply.

4. The leading Ohio case is *Ruedy v. Toledo Factories Co.*, 61 Ohio App. 21, 22 N.E.2d 293 (1939). *See also, Chadwick v. Air Reduction Co., Inc.*, 239 F.Supp. 247 (N.D.Ohio 1965).

Nor is it clear that any changes worked by *Wilson* would be opposed by Ohio courts. Because *Wilson* is a new decision, this Court must try to decide the present question as a New Jersey or Ohio court would decide it in light of the *Wilson* rationale. Even if the law were not the same on this question, or if Pennsylvania law were sought to be applied, or if *Wilson* has made Ohio and New Jersey law different, this Court is convinced that under the New Jersey conflicts of laws test, New Jersey substantive law would be applied because New Jersey would have the greater interest in this action. *See discussion in Lopata v. Bemis Co., Inc.*, 406 F.Supp. 521 (E.D.Pa.1975).

1975.) It was purchased by plaintiff's employer in 1966 after it had been rebuilt by Erie Engine Co., a subsidiary of Zurn Industries.[5] Plaintiff contends that the rebuilding of the machine did not change it, neither correcting nor worsening the alleged defect. Movants claim that the rebuilder changed the machine substantially so that it could perform functions for which the machine was not originally designed. These facts are in dispute and can only be resolved by a jury. However, the fact that the machine was rebuilt does have a bearing on the present motion.

On December 31, 1944, Adamson Machine Co. agreed to sell all its assets to United Engineering & Foundry Co., a Pennsylvania corporation, or to United Engineering & Foundry Company's wholly owned subsidiary, Adamson United Co., an Ohio corporation.[6] The sale was actually consummated in January, 1946, at which time Adamson Machine Co. was liquidated. Adamson United continued in the same business as Adamson Machine Co. On April 21, 1970, Adamson United merged with its parent corporation, United Engineering & Foundry Co.[7] Almost two years later, on December 15, 1971, United Engineering & Foundry Co. merged with Wean Industries, Inc., to become Wean United, Inc.[8] (See affidavit of Henry C. Westin, counsel for Wean United, Inc., Sept. 10, 1975.)

Plaintiff contends that because Adamson Machine Co., the manufacturer of the machine which caused plaintiff's injury, is no longer in existence, the corporation which purchased its assets or those which were subsequently merged with the purchaser of Adamson Machine Company's assets, should be held to have assumed Adamson Machine Company's tort liability.

The issue before the Court is whether tort liability should be imposed upon the movant corporations if it is found that Adamson Machine Co. had manufactured a defective machine, or one without adequate safeguards. The leading case in New Jersey on this subject before *Wilson* was *McKee v. Harris-Seybold Co., supra.*

The court in *McKee* succinctly stated the position accepted by a majority of jurisdictions on this question. The court said (109 N.J.Super. at 561, 264 A.2d at 101):

"It is the general rule that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape liability for such debts."

The court added that "[a] fifth exception, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer." *See also,* W. Fletcher, *Cyclopedia of the Law of Private Corporations,* §§ 7122–7124 (Rev.ed.1962); 19 *Am.Jur.2d* § 1546.

In order to determine whether the sale of assets in the present case falls within one of the five *McKee* exceptions to the general rule of nonliability it will be necessary to examine the circumstances of the sale of Adamson Machine Company's assets. It is clear that if one of these exceptions applies to Adamson United Co., then the subsequent de jure mergers would have retained liability for the corporations that succeeded Adamson United Co. right down to the present company, Wean United, Inc.

The contract of sale between Adamson Machine Co. (hereinafter Adamson) and United Engineering & Foundry Co. (herein-

---

5. The date when the machine was rebuilt is not in the record.

6. Adamson United Co. was incorporated in Ohio on December 26, 1944.

7. The certificate of incorporation was issued by Pennsylvania on June 19, 1970.

8. The certificate of incorporation was issued by Pennsylvania on December 30, 1971.

after United) made it clear that United planned to carry on, through its subsidiary Adamson United Co., the same business previously conducted by Adamson. *See,* Contract of Sale (Dec. 31, 1944), p. 2 (appended to Westin affidavit). It was agreed that Adamson would sell all its assets, including all its real estate, buildings, articles, machinery, tools, implements, appliances, patents, drawings, designs, trademarks, good will, inventories, raw materials, stock, work in progress, and accounts receivable as of January 1, 1945.[9] Upon completion of the sale Adamson was to be liquidated.[10] The purchase price was $500,000 cash. There was no exchange of stock. The name of the new corporation, created just a few days before the purchase, was so similar to the selling corporation's as to give rise to the inference that the purchasing corporation was attempting to capitalize on Adamson's good will and continue in much the same way as Adamson.

The contract specifically stated that Adamson's vice president, F. L. Dawes, who signed the contract of sale for the company, and Andrew Hale, another management-level employee, were to be retained by Adamson United Co. In fact, the contract made the sale contingent upon their availability to work for Adamson United. The contract reads (p. 6):

"It is understood that United is not familiar with the rubber machinery business and it is agreed that the consummation and carrying out of this Agreement by the purchaser is contingent upon the purchaser obtaining the services for a period of years of F. L. Dawes and Andrew Hale, and, unless it is certain that both of these men are free to accept such employment, free and clear of any obliga-

tion or restriction of the War Manpower Commission, the War Production Board or other Government agency, this Agreement shall, at the option of the purchaser, be of no force or effect."

The contract also specifically disclaimed assumption of any liabilities of Adamson. It states:

"It is understood and agreed that neither United nor the new corporation to be organized by it assumes any liabilities or obligations whatsoever of Adamson, except the obligation to complete orders in process of manufacture or previously accepted for sale or manufacture by Adamson, all of which the purchasing corporation shall prosecute to completion for its own account. Except as to any such obligations, Adamson will pay all its corporate debts and discharge all its corporate liabilities and obligations, to the end that there shall not be at any time any lien, charge or encumbrance whatsoever upon any of the property and assets hereby acquired from Adamson."

The contract does call for the retention of $25,000 to cover the cost of contingent liability over the amount owed to creditors and the amount owed in taxes. This sum obviously was intended to cover any tort claims from those who might become injured by Adamson's products. The contract states (p. 4):

"To assure its responsibility for the full discharge of all its obligations and liabilities, Adamson, in the process of liquidation and dissolution, shall, for a period of not less than one (1) year after the transfer of its assets, retain in its treasury a sum of not less than Twenty-five Thousand Dollars ($25,000.00), which shall be over and above the amount of its liabili-

---

9. "The intent and purpose hereof is that Adamson is hereby selling to United, or its said nominee, all its assets and property, except only actual cash on hand." Contract of Sale, p. 2.

10. " . . . in pursuance of an intention to discontinue business, liquidate its affairs and dissolve, has determined to sell and dispose of its corporate assets and property . . ." Contract of Sale, p. 2.

The contract went on to state specifically that "Adamson agrees, upon consummation of this transaction, that it will discontinue manufacturing operations for its own account and cease to transact all business, except such as shall be directly incident to its ultimate liquidation and dissolution." Contract of Sale, p. 4.

ties to creditors, plus the amount of its federal tax liability as shown by its closing statement of assets and liabilities."

None of the directors or stockholders of Adamson became directors or stockholders of Adamson United. Westin affidavit, ¶ 9.

These facts give no indication of fraud on the part of either contracting party. Obviously, there was no attempt to avoid satisfaction of a tort claim that would not occur for almost another 30 years. The $25,000 contingent liability fund is dispositive of a lack of intent to defraud tort claimants in this situation. Thus exception 4 does not apply. Nor does exception 5 apply, because the consideration, $500,000, appears perfectly adequate.

■ The contract makes no explicit nor implicit assumption of tort liability. In fact, the clause disclaiming Adamson's liability can be interpreted as disclaiming tort liability as well as contractual liability. However, a disclaimer of tort liability will not prevent a corporation from having liability imposed on it, if there has been either a de facto merger, or if the purchasing corporation is a mere continuation of the seller.

If this sale of assets fits into any *McKee* exception, it must be exceptions 2 or 3, that is, plaintiff must show that the sale was either a de facto merger, or the purchasing corporation was a mere continuation of the seller.

■ In *Shannon v. Langston Co.*, 379 F.Supp. 797, 801 (W.D.Mich.1974), the court succinctly summarized the de facto merger criteria as set forth in *McKee v. Harris-Seybold Co.*, *supra*, 109 N.J.Super. at 564–65, in this fashion:

"(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation."

Not all of these factors are needed to demonstrate a merger; rather, these factors are only indicators that tend to show a de facto merger. *See, Good v. Lackawanna Leather Co.*, 96 N.J.Super. 439, 233 A.2d 201 (Ch. Div.1967).

■ The policy behind imposing liability on the purchasing corporation is based on the notion that no corporation should be permitted to place into the stream of commerce a defective product and avoid liability through corporate transformations or changes in form only. If a corporation continues to exist, or is merged into another, liability is retained. However, the sale of a corporation's assets alone does not contemplate the sale of the corporation's contingent tort liability. Even the sale of the corporate business is liability free provided ownership and management have not remained the same. Retention of control by the selling corporation or continuity of management indicates a change in form only.

"The public policy behind the evolving common law of products liability is that the enterprise, the going concern, ought to bear the liability for the damages done by its defective products. While the incidence and amounts of such damages are not perfectly predictable, they are nonetheless regarded as an economically and socially necessary cost of doing business." *Shannon v. Langston Co.*, *supra* at 802.

The court in *McKee* applied the above criteria to determine whether a de facto merger had indeed occurred. It will be instructive to set forth the *McKee* facts and demonstrate how the court applied the de

facto merger criteria to those facts in arriving at its conclusion that no merger in fact had occurred.

The facts in *McKee* are particularly instructive to this Court because those facts were very similar to those in the present action. In *McKee* the plaintiff was injured by a machine manufactured in 1916, decades before plaintiff's injury, by the Seybold Machine Co. of Dayton, Ohio. On November 22, 1926, Seybold agreed to sell *certain* assets and liabilities to Harris Automatic Press Co. of Cleveland, Ohio. The contract was assigned to a new corporation called Harris-Seybold-Potter Co., which later changed its name to Harris-Seybold Co. This company later acquired another called Intertype Co.

The initial sale by Seybold included such assets as the business, property, good will, and authorized use of the company name. There was a clause holding the acquiring company free from any undisclosed or contingent obligations not incurred in the ordinary course of manufacturing since June 30, 1926. The former Seybold agreed to change its name and continued to operate, but in a different business, until it dissolved on February 9, 1928. The allegedly defective machine was installed by another defendant, Hagman. Harris-Seybold claimed that plaintiff's injury was a result of Hagman's negligence in installation. This resulted in a situation where Harris-Seybold was not the only party against whom the plaintiff could seek relief.

The only liability Harris-Seybold had contracted to assume was for open accounts on purchases and accrued bills such as water, taxes, payroll, etc. The court in *McKee* read the term in the contract that only liabilities incurred "in the usual course of its manufacturing business, but not otherwise" subsequent to June 30, 1926, and "no undisclosed or contingent obligations" to exclude any express or implied assumption of contingent tort liability. 109 N.J.Super. at 563, 264 A.2d at 102.

The purchase in *McKee* was for $2,000,000 and 5,500 shares of common stock. The shares, the court concluded, were a negligible part of the purchase price. There was little, if any, stockholder continuation. Two management personnel were retained, the court found, solely "to insure the economic stability of those officers immediately after the transfer." 109 N.J.Super. at 570, 264 A.2d at 106.

These facts led the court to grant defendant Harris-Seybold's motion for summary judgment. The court had reasoned that the sale was basically for cash. The old corporation's stockholders held no real interest in the new corporation. The directors and officers were different, and so was the management. The two employees retained were retained to insure their own economic stability. The Seybold Company did continue to function as a separate business. There was no absorption of Seybold by the new corporation.

The facts in *McKee* gave rise to no de facto merger; a fortiori the facts in the present case do not. The sale here, like that in *McKee*, involved no continuity of management or control. As in *McKee*, only two management-level employees were retained to aid in the transformation. It is true that the court in *McKee* noted that these employees were retained to maintain their own economic stability, while in the present case the retained employees were to be utilized to help the new corporation learn the business upon which it was about to embark. Yet this difference is not dispositive of a different result. Both Dawes and Hale were employed by Adamson United Co. to give the company the necessary knowledge to operate the business. Their services can be considered as the same kind of resource as the machinery or patents of the business. What is crucial is that they did not control or maintain the control of the defunct Adamson. Nor does the fact that the contract conditioned the same on their availability change this result. In both *McKee* and the present case the retained management-level personnel were required to remain only temporarily.

There was no identity of directors or stockholders in the present case, whereas in *McKee* there might have been some, though

negligible, stockholder identity. No stock was transferred from Adamson to its purchaser. In *McKee* some stock was in fact transferred. In the Adamson sale the transaction was strictly a cash transaction. All the indicia in both cases point to a lack of control of the purchasing corporation by the selling corporation. There was no pooling of interests.

■ In *McKee* the selling corporation lasted only two years after the sale; here the selling corporation liquidated soon after the sale was completed; but both corporations remained distinct in both cases. The survival of the seller corporation, though a factor, is not dispositive. Often the seller becomes a mere shell and dissolves soon thereafter. *See*, Janet B. Fierman, "Assumption of Products Liability in Corporate Acquisitions," 55 Boston Univ.Law Rev. 86, 99–100 (1975).

■ Adamson United did continue the business of Adamson, just as Harris-Seybold had continued Seybold's business, but that is not enough to predicate imposition of tort liability. *See, National Dairy Products Corp. v. Borden Co.*, 363 F.Supp. 978 (E.D.Wis.1973). The test is whether the new corporation constitutes merely a "new hat" for the old corporation. *See, McKee v. Harris-Seybold Co.*, supra, 109 N.J.Super. at 570, 264 A.2d 98.

The $25,000 reserved for contingent tort liability in the present case was adequate considering both the purchase price and the era. There was no sum reserved for contingent liability in *McKee*, yet the court failed to find a merger or continuation.

Thus under the *McKee* rationale and after a comparison of the present facts with those in *McKee*, there would seem no justifiable reason to impose unbargained-for liability on the purchasing corporation.

*McKee* does not articulate a different test for the mere continuation exception, but utilizes much the same test that it defines for merger. Ultimately, the question the *McKee* court poses is whether the purchasing corporation is merely a "new hat" for the selling corporation. The *McKee* court stated this clearly, saying (p. 570, 264 A.2d p. 106):

> "When one company purchases all the assets of another it is to be expected that the purchasing corporation will continue the operations of the former, but this does not by itself render the purchaser liable for the obligations of the former. For liability to attach, the purchasing corporation must represent merely a 'new hat' for the seller."

Here again there seems to be no indication that this is the case. Therefore, applying the *McKee* reasoning, there is no exception under which this sale might fall, and consequently liability would not be imposed.

Prior to *Wilson*, there have been no cases which would suggest a result different from that arrived at under *McKee*.[11] However, both *Shannon v. Langston Co.*, supra, and *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3rd Cir. 1974), cert. den., 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975), have stressed public policy reasons for imposing liability where the buyer has reaped the benefits of the seller's business organization and where the injured party would be otherwise remediless. Yet, neither case was a total departure from prevailing law. *Wilson* relied to a great extent on this public policy rationale.

Judge Feller, who decided *Wilson*, explained in a letter, April 15, 1976, p. 2, to the parties that his decision did not overrule *McKee*, but merely amplified that decision. He stated, "[t]he court notes that this disposition is not a reversal of the law as espoused in *McKee*, but rather a broad reinterpretation of the law *and its application to the facts in this case.*" This Court reads Judge Feller's opinion in *Wilson* not to overrule *McKee* but to expand on the means of demonstrating de facto mergers or continuation.

---

11. That is, there is no New Jersey case which would suggest a different result. *See*, W. Fletcher, *Cyclopedia of the Law of Private Corporations*, §§ 7122–7123 (rev. ed. 1962); 66 A.L.R.3d 824, for a list of cases.

In *Wilson* the machine which caused plaintiff's injuries was composed of parts manufactured by two corporations, James Hunter Machine Co. (hereinafter Hunter) and George S. Harwood and Sons, Inc. (hereinafter Harwood). The machine was installed in plaintiff's employer's plant in 1952. In 1972 plaintiff sustained his injuries. In the interim, both manufacturers had sold their assets.

In 1961 Crompton & Knowles Corp. (hereinafter Crompton & Knowles) agreed to purchase some of Hunter's assets, including the property and the business. Hunter operated after the sale, in a completely different business and with a completely revised corporate purpose, as Hunter Investment Corporation, while the purchased business operated under the name James Hunter Machine Co.—a Division of Crompton & Knowles.

The only assets not sold were an out-of-state property, specific life insurance proceeds, trade notes and accounts receivable, and securities. The contract specifically stated that Crompton & Knowles would not assume liability from any claim or cause of action of any nature prior to the closing. The assets were purchased with 30,000 shares of common stock of Crompton & Knowles at a value of $30 per share, plus a $1,000,000 promissory note, and cash if book value exceeded $1.9 million, plus $150,000. Crompton & Knowles agreed to assume all contracts with customers entered into in the ordinary course of business by Hunter, as well as other commercial liabilities. The president of Hunter became vice president and director of Crompton & Knowles and president of the James Hunter Machine Co. Division. Crompton & Knowles operated as Hunter had with the same employees, equipment, etc.

Under the *McKee* test this corporate sale would constitute either a de facto merger or a continuation of the selling corporation. The *Wilson* court, in finding a merger under these facts, did not depart from existing New Jersey law. Half of the purchase price was comprised of stock, thus giving stockholders of the selling corporation an interest in the purchasing corporation. The same business operation was continued by the purchaser with the same management and employees. The president of the seller became president of the purchasing corporation, not for a limited time as in *McKee*, and not to educate the purchaser in the business as in the present case. Certainly, viewing these facts,[12] there is nothing in the *Wilson* holding with respect to the Hunter sale which would change the result as reasoned under *McKee*.

However, the sale of Harwood's assets presents a more difficult question. In that 1967 sale, Harwood sold to Davis & Furber Machine Co. (hereinafter Davis & Furber) all its right, title and interest to the Bramwell trademark, together with its good will and its business of making Bramwell feeders, and name, for $200,000. Fare Well Corp., which owned part of the Harwood business and whose president was Sydney Harwood, also joined in the sale to Davis & Furber. Fare Well dissolved in 1968. Also sold to Davis & Furber by both corporations were Harwood's causes of action for any trademark infringement.

There was no express or implied agreement to assume tort liability, nor was there a showing of fraud, nor a lack of consideration. There was no stock transfer; the sale was strictly for cash. The corporation operated at a different location. There was some personnel change, but the same product was manufactured. Davis & Furber expressly undertook to inspect, service and repair products previously manufactured by Harwood.

Under *McKee*, most of these facts would tend to suggest that no liability should be imparted to the purchasing corporation, Davis & Furber. Yet Davis & Furber's express undertaking to service and repair Harwood's products might change that outcome. The court, however, focused upon another crucial fact in the case. At the time of the sale, a letter was circulated to

---

12. The only different fact in *Wilson* is that Hunter, once it changed its corporate purpose, did not liquidate, but rather continued to function long after the sale.

Harwood customers instructing them to give their future orders to Davis & Furber. The letter stated that both the president of Harwood and another executive were joining Davis & Furber. A second letter was sent out by the president of Davis & Furber to its customers. This letter said that "the joining of the two long-standing companies will strengthen the efforts in the advanced development of machines for the textile industry." 140 N.J.Super. at 484, 356 A.2d at 463.

The court found that these letters expressed the true intent of the sale. The intent, Judge Feller found, was to merge the two corporations. This clear expression of intent plus Davis & Furber's express agreement to service and repair Harwood products overrode the lack of commonality of stockholders, personnel and directors required under *McKee* for a finding of de facto merger. *See also, Kloberdanz v. Joy Mfg. Co.*, 288 F.Supp. 817, 821–22 (D.Colo. 1968); *Applestein v. United Board & Carton Corp.*, 60 N.J.Super. 333, 159 A.2d 146 (Ch.Div.1960), aff'd, 33 N.J. 72, 161 A.2d 474 (1960).

The court also noted that recent cases suggested that the better rule would be to depart from the *McKee* "mere continuation view" of merger, and consider the social policy involved.

In *Knapp v. North American Rockwell Corp., supra*, one of the cases relied upon in *Wilson*'s social policy argument, but a case decided under Pennsylvania law despite a lack of clear Pennsylvania precedent, the court found a de facto merger where the sale was an exchange of stock in the purchasing corporation for assets of the seller. The seller distributed the shares to its stockholders and promised to liquidate as soon as practicable. The shares could not be sold to pay for contingent liabilities, and there was therefore no money with which to pay such claims. These facts would tend to show the commonality or identity of stockholders, a prime ingredient in the *McKee* criteria for de facto merger. But,

as the *Wilson* court noted, the *Knapp* court went further. It then added a strong public policy rationale.

The *Knapp* court stated that sound policy considerations dictated that the sale be treated as a merger for purposes of imposing tort liability. One of the crucial considerations in *Knapp* was whether the seller corporation had sufficient assets to respond to contingent liability. Clearly, the $25,000 in the present case demonstrates that the seller corporation did not try to denude the corporation of all assets so it could not respond in damages to tort claims, which distinguishes it from *Knapp. See, Bouton v. Litton Industries, Inc.*, 423 F.2d 643 (3rd Cir. 1970).

*Knapp* only argued that where a corporation had been responsible for the manufacture of a defective machine, and had not provided any fund for contingent claims because it had traded assets for stock, and since its owners by virtue of that trade held some control of the purchaser corporation, it would not be unfair to impose liability on that purchaser corporation. More or less, the owners of the corporation which manufactured the defective machine would be the same parties who would be compelled to respond in damages simply by following, through the change in form, their interests. Yet, the court in *Knapp* articulated this in a "deep pocket" theory. The purchasing corporation could have protected itself, the court noted, by buying insurance.

Despite this dictum in *Knapp* and the similar public policy arguments raised in other cases, *see, e. g., Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir. 1974) (the going concern should respond in damages to tort claims of its predecessor as a socially necessary cost of doing business, but where the facts indicate that even under *McKee* a finding of continuation could be made); *Shannon v. Samuel Langston Co., supra* (exchange of stock for assets, merger under *McKee*), none of these decisions calls for the imposition of liability on a purchaser where the seller retains no control.[13]

---

**13.** Plaintiff's reliance on *Shane v. Hobam, Inc.*, 332 F.Supp. 526 (E.D.Pa.1971), is misplaced as the facts which gave rise to the social policy therein are totally distinguishable. *See, Gani v. Ball & Jewell, Inc.*, unpublished opinion, Docket No. A–1676–73 (App.Div., July 18, 1975).

*Shannon, supra* at 803, states this policy in these terms, "[s]imilarly, solvent corporations, going concerns, should not be permitted to discharge their liabilities to injured persons simply by shuffling paper and manipulating corporate entities." The court added that the purchaser "got all the advantages of an established going concern, including expertise, reputation, established customers, and so forth. Public policy requires that Harris Intertype [the purchaser], having received the benefits of the going concern, should also assume the costs which all other going concerns must ordinarily bear."

The *Wilson* court concluded that this policy influenced it in finding that the modern approach would be to find that

". . . the most relevant factor is the degree to which the predecessor's business entity remains intact. The more a corporation physically resembles its predecessor, the more reasonable it is to hold the successor fully responsible. In this way, the innocent, injured consumer is protected without the possibility of being left without a remedy due to the subsequent corporate history of the manufacturer." 140 N.J.Super. at 490, 356 A.2d at 466.

In the cases where the social policy imposing liability was employed, the courts were presented with a situation where the only possible defendant was the purchasing corporation. With the choice being between the consumer and the "successor" corporation, the choice was easy, especially where factors indicated some elements of continuity or merger.

Before *Wilson*, this social policy had never, that this Court can find, been applied to find a merger or continuation in a situation,

in a jurisdiction following the *McKee* rationale, where the *McKee* test would indicate otherwise. Even in *Wilson*, the absence of *McKee* enumerated factors in the Davis & Furber purchase did not call for a departure from *McKee* itself. The court found that the two letters clearly demonstrated an intent to merge the corporations. Once that intent was found, the court could apply the public policy of imposing liability on the purchaser. The clear showing of intent, as well as the obligation of servicing and repairing the machines, was a substitute for the *McKee* enumerated factors. Besides, it makes sense to impose liability on the company responsible for the service and repair of the machine, when the company that manufactured it has been dissolved and succeeded by the company that has undertaken the obligation of maintenance.

■ In the present case, there was no indication whatsoever of any intent to merge the two corporations or to continue Adamson. Nor was there an agreement to service or repair Adamson machines. Absent that intent or that agreement, there is no basis for imposing liability on Adamson United Co. or its successors. If this Court were to read *Wilson* as saying that all corporations which purchase another corporation's assets, despite the nature of the purchase, will be held liable in tort for claims arising from injuries sustained from the seller's products, the Court would be completely reversing *McKee*.

*McKee* specifically states, as do treatises, see, Fletcher, *Cyclopedia of the Law of Private Corporations, supra*, §§ 7122–7124, that the general proposition is that purchasing corporations generally do *not* assume liability.[14] It is an exception to the general

---

**14.** "A corporation that purchases another corporation's assets is, in essence, a purchaser of property, and, under a traditional rule of property law that was developed to facilitate the transfer of property, a bona fide purchaser who gives adequate consideration and has no notice of prior claims against the property acquires no liability for those claims. The

general rule of nonassumption of liability is interrelated with the rights of creditors to payment in satisfaction of their claims out of corporate assets. Creditors can be paid out of the consideration received from the buyer as long as it is adequate." Fierman, "Assumption of Products Liability in Corporate Acquisitions," *supra* at 93.

rule when they do. If *Wilson* means that despite what a corporation does it cannot avoid liability, that indeed would not only change *McKee* but it would affront the law as recognized by a majority of our jurisdictions, including those which have employed the "deep pocket" public policy rationale.

 Besides, in the present case, as in *McKee*, there are other parties against whom the plaintiff can proceed. The Court is not faced with the choice of either the plaintiff or the purchasing corporation paying for plaintiff's injuries. Here, the plaintiff can and is suing the seller and the rebuilder of the machine, which is 56 years old. The rebuilder, it may be found, had changed the machine substantially, thereby undercutting any rationale based on the assumption that since the purchasing corporation operates in the same business as the manufacturer, it can control the safety of such products. Here it is the rebuilder, or perhaps the seller, who can be charged with quality control. As one commentator has noted, "[t]he liability imposed should be commensurate with the successor's degree of product control." Fierman, "Assumption of Products Liability in Corporate Acquisitions," *supra* at 109.

No social policy is served by imposing unbargained-for liability on a corporation just because it purchases assets. *McKee* does not so hold, nor do any of the cases this Court has seen, nor, does this Court believe, does *Wilson*.

Absent the clear intent to merge or continue, absent the *McKee* factors indicating merger or continuation or an express agreement to service and repair, and in light of the availability of other defendants against whom plaintiff may seek relief and the intervening rebuilding of this 56-year-old machine, to impose liability on Adamson United Co. would stretch *Wilson* to an absurd result. We do not think New Jersey would take that step.[15]

Since there is no genuine issue of material fact, summary judgment is appropriate. *Lockhart v. Hoenstine*, 411 F.2d 455 (3d Cir.), *cert. den.*, 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969); *Lopata v. Bemis, Inc.*, 406 F.Supp. 521, 525 (E.D.Pa.1975). For the reasons stated, this Court, acting as I believe a New Jersey court would, grants movants' request for summary judgment against plaintiff and defendant Zurn Industries.

Counsel will submit an order in conformity with this opinion.

---

**15.** Plaintiff's argument that because New Jersey in 1969 made the right of dissenting shareholders to call for an evaluation of their shares in case of a merger, the *McKee* test would thereby be changed, is totally without merit.