NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2454-18

160 WEST BROADWAY
ASSOCIATES, LP,

      Plaintiff-Respondent,

v.

1 MEMORIAL DRIVE, LLC,

      Defendant-Appellant,

and

AMMA CORP.,
NRVP, LLC, BOULEVARD
CORP., and ANTONIO PEREZ,

      Defendants.
_____

> **APPROVED FOR PUBLICATION**
>
> **March 11, 2021**
>
> **APPELLATE DIVISION**

Argued November 16, 2020 – Decided March 11, 2021

Before Judges Messano, Hoffman, and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-4142-15.

Justin D. Santagata argued the cause for appellant (Kaufman, Semeraro & Leibman, LLP, attorneys; Justin D. Santagata, on the briefs).

Peter R. Bray argued the cause for respondent.

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Plaintiff, 160 West Broadway Associates, LP, owned a strip mall in Paterson and leased part of the premises to defendant Amma, Corp. (Amma), which operated a supermarket on the site using the trademarked name "Super Supermarket." Defendant Antonio Perez and his wife Mireya were equal shareholders in Amma, and both were salaried employees of the corporation; their son Jeffrey also worked at the supermarket.[1] On April 29, 2014, Amma served notice that it was terminating the lease the next day and effectively ceased all business operations.

In June 2013, defendant 1 Memorial Drive, LLC (Memorial), a limited liability company formed in 2010 and owned equally by Perez, Mireya, and Jeffrey, opened its business less than one-half mile away, operating a supermarket also called "Super Supermarket." NRVP, LLC (NRVP), in which Perez and Mireya had equal interests, owned the real estate, and leased the store to Memorial.

Plaintiff filed a complaint alleging that Amma violated its lease, and it sought damages for the unpaid balance of rent for the lease term. Plaintiff also

---

[1] To avoid confusion, we refer to Mireya and Jeffrey by their first names. We intend no disrespect by this informality.

alleged that Perez was "[t]he common thread" between Amma, Memorial, and the other defendants, and it sought a declaration that Memorial was a "successor to Amma" and "liable for its debts." Plaintiff further alleged defendants violated the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34.

The balance of plaintiff's complaint was dismissed on summary judgment prior to trial.[2] Following an extended non-jury trial before a different judge, the court entered judgment against Memorial "as the successor" to Amma in the amount of $327,927.11, and also awarded plaintiff $129,943.75 in counsel fees and costs.

## I.

## A.

We summarize the trial evidence as necessary to resolve the issues raised on appeal.

A FineFare supermarket was the anchor store in plaintiff's strip mall. In 1994, Amma purchased the supermarket, approximately 16,000 square feet, and operated it as "Super Supermarket." The Perez family owned several other supermarkets throughout New Jersey.

---

[2] Plaintiff has not cross-appealed from that order.

In 1995, Amma executed a fifteen-year lease with plaintiff. However, disputes arose over the renewal option, leading Amma to file suit and plaintiff to counterclaim for possession. After a non-jury trial, the judge found in Amma's favor and ordered the lease renewed for an additional five years, i.e., until September 30, 2015. The judge filed an extensive written opinion that included multiple factual findings based on the trial testimony.

Plaintiff's principal, James Nuckel, testified at this trial that Perez told him Amma intended to stay for the entire extended term. However, on April 29, 2014, Amma served written notice it would vacate the supermarket the following day and effectively did. Plaintiff immediately began advertising for a new tenant, but it was not until November 2014 that Moran Foods, LLC (Moran) executed a letter of intent to lease the space. In July 2015, plaintiff signed a lease with Moran but needed to obtain site plan approval from the Planning Board and building permits to fit out the space for Moran. In late 2015, contemporaneous with the Planning Board's hearing on the application, Perez, who also owned a car wash on adjacent property, objected. According to Nuckel, because the permit and approval process took so long, Moran rescinded the lease, and the space remained vacant through the end of Amma's lease term.

A-2454-18

Perez, Mireya, and Jeffrey formed Memorial in December 2010, and built a 30,000 square foot supermarket from the ground up on land leased from NRVP. Construction began in 2012. Jeffrey testified that Memorial obtained $1.5 million in financing to construct the store from General Trading, a wholesale food distributor, which also financed the inventory for the new store. Perez, Mireya, and Jeffrey personally guaranteed the financing. Memorial began operating the supermarket as Super Supermarket in June 2013, nearly one year before Amma ceased operations.

Jose Bombino, Amma's accountant, testified that Perez and Mireya decided to dissolve Amma and advised him of their decision during discussions in March 2014. Perez said the decision was prompted by rising expenses and falling sales at the store. Bombino testified that Amma's supermarket was earning a profit, albeit less than other supermarkets the Perez family operated. Perez and his wife split approximately $66,000 in net annual income from Amma in 2013, and the corporation formally dissolved in December 2014.

Bombino identified Amma's total assets as reflected on its federal tax return at the end of 2013: $411,125 in inventory; $48,000 in other "current assets," which included lease and utilities security deposits and a liquor license; and $230,350 in intangible assets, which reflected "goodwill." The

5

goodwill had been carried as an asset on Amma's books since it purchased the FineFare.[3]  At trial, Memorial's expert forensic accountant, Nicolas Cafaro, explained goodwill was an accounting term that simply reflected the premium Amma paid when it purchased FineFare's business, i.e., "the amount over and above the value of the assets purchased."  Bombino agreed with this characterization of the asset.

Memorial produced an expert in trademarks, Daniel Roche, who testified that a trademark and goodwill are separate assets.  Amma applied to register Super Supermarket as a trademark in 2002, and Amma's insurance agent, Mario Fernandez, testified the trademark expired in 2009 because Amma failed to pay for its renewal.  Fernandez's efforts to renew the trademark were initially unsuccessful because the name was too "generic."  With the assistance of counsel, Fernandez succeeded in June 2014 to register Super Supermarket's trademark.  However, the attorney advised Fernandez that the trademark needed to be registered to an active company; knowing of Amma's impending dissolution, Fernandez had Amma assign the trademark to Memorial without compensation.

Roche explained that the initial denial of renewal was significant, because "descriptive" trademarks, like Super Supermarket, are of little or no

_____

[3]  Bombino did not become Amma's accountant until 2010.

value under trademark law. He opined that the value of the trademark in 2014 was $740, the costs of renewal, and nothing more. Roche noted that four other supermarkets in New Jersey used the same trade name. Furthermore, that there were no applications to trademark the name during the period it had lapsed demonstrated it had little value.

Jeffrey testified that he ran Memorial's supermarket, something his father confirmed during his testimony. Memorial was a "full-scale" supermarket that appealed to different clientele than Amma's smaller market, which Jeffrey described as a "bodega." Jeffrey said that none of Amma's fixtures, refrigerators or shopping carts were re-located to Memorial's store. He said Amma and Memorial never shared a bank account, and Amma provided no funds and transferred no assets to Memorial.

Daniel Resnick built Memorial's supermarket and was familiar with both stores. His company removed all the fixtures and equipment from Amma's store; Resnick, who also refurbished supermarket equipment for resale, said that Amma's property "was not reusable," and he took it to a junkyard. Resnick also characterized Amma's supermarket as a "bodega."

Although Jeffrey said only one or two employees moved to Memorial's store from Amma's store, plaintiff produced Katherine Alvarez as a witness. She was a cashier at Amma's store and moved to the same position at

Memorial's. According to Alvarez, about seven other Amma employees out of eleven total employees moved to work at Memorial's supermarket. She acknowledged, however, that she was required to complete a new job application before starting her employment at Memorial's supermarket.

B.

The judge rendered an oral decision after completion of the testimony and consideration of the parties' written summations.

Initially, the judge incorporated findings made by the judge in the prior lease renewal litigation. He noted the prior judge found that Perez realized the new supermarket would not be completed before Amma's lease with plaintiff expired, and Perez wanted to stay in plaintiff's strip mall "to prevent a competing supermarket from coming in, taking over that property, and therefore competing with him." The judge adopted the prior judge's conclusion that Perez intended to keep Amma's operation in place, "either as a supermarket or if need be as a warehouse." The judge determined Perez "would have loved to have just at the time when that five[-]year extension was coming to an end . . . go right into the new location. But timing doesn't always work that way." In adopting these earlier findings and reaching this conclusion, the judge said: "When I say Mr. Perez . . . , I mean for now at

least, I'm lumping Amma, [Memorial], Mr. Perez, the Perez family, I may use those terms interchangeably."

The judge discussed our decision in <u>Woodrick v. Jack J. Burke Real Estate, Inc.</u>, particularly noting our identification of "four well-established exceptions" to the general rule that a corporate transferee is not liable for the corporate transferor's debts. 306 N.J. Super. 61, 72–73 (App. Div. 1997) (citing <u>Ramirez v. Amsted Indus., Inc.</u>, 86 N.J. 332, 347–48 (1981)). After identifying those four exceptions, the judge continued:

> I am . . . convinced by clear and convincing evidence that the transaction amounts to a consolidation or merger of the seller and the purchaser. I am also clearly and convincingly convinced that the proofs in this case establish that . . . Memorial . . . is merely a continuation of Amma . . . .
>
> I do find also that the fourth exception [to the rule against successor liability] applies here by clear and convincing standard. That the transaction, the transfer from Amma to . . . Memorial . . . was done in order to escape responsibility for the debts of Amma, that being the [nineteen] months of rent.

The judge also found the two supermarkets were "certainly essentially the same."

> Obviously[,] it's not identical ownership, but to me it's essentially the same ownership . . . . [I]nstead of just husband and wife[,] it's husband and wife and child, all within the same family. To me I don't see that as separate or different ownership. I mean it's not like it's some outsider, a third-party who is an investor.

It's a family business. And the old operation was family run, and so is the new operation. The differences are minimal in my mind. In fact[,] the only difference is instead of Super Supermarket being owned by Amma, it's owned by . . . Memorial . . . . It's exactly what the law talks about, changing the hat.

By way of similar factors . . . I find the same people owning the operation. It's the same business. The same type of business.

The judge rejected the assertion that Amma's supermarket was merely a bodega, finding that 15,000 square feet was a "pretty large supermarket." He found the intent of the Perez family was to continue the same business in a larger space.

[S]hort of going from one location in a shopping center to another location, it's virtually impossible to get these two entities as close as they are. It's about a third of a mile . . . . [I]t's clearly within walking distance, it's very close. The two entities have the same customers. For the most part, the same employees, the . . . same exact name . . . . [T]o me the similarities that exist are heavy, and you know I'd have to close my eyes to reality if I were to not conclude that the intent . . . of the Perez family was to continue this business.

The judge concluded that "the purchasing corporation [wa]s merely a continuation of the selling corporation[,]" and defendants' efforts "were designed to avoid having to pay those last nineteen months of rent."[4] The

_____

[4] There were seventeen months left in the lease term.

10                                                    A-2454-18

judge found successor liability, stating "merely changing the corporate name from Amma to . . . Memorial . . . was not enough."  Because he found successor liability, the judge declined to consider plaintiff's UFTA claims.[5]

As to the value of the trademark, the judge stated:

> I was impressed . . . with the testimony of Daniel Roche . . . .  I think he was very competent, but I don't accept his opinion, or at least I'll make these observations with respect to his opinion.  He evaluated the name Super Supermarket by applying the fair market definition of fair market value from the IRS revenue rulings . . . .
>
> Now I believe that Mr. Roche did this on a macro evaluation.  In other words, I believe that he looked at the trademark Super Supermarket and said look, virtually this thing has zero value.  And the way I took his testimony was yeah, it has zero value in Kentucky, Seattle, and maybe even in Cape May.  But in this neighborhood, this little pocket where those people have to walk and come to know the name Super Supermarket, it has value.  It has more value than the minimal amount that he was attributing to it.
>
> . . . Maybe the name Meyer Brothers is meaningless in San Diego, but in Paterson it's a valuable name.  Or Edwins . . . , the little sporting

---

[5]  Plaintiff has not filed a defensive cross-appeal from the trial judge's failure to find violations of the UFTA or otherwise address them in his opinion, and plaintiff has not requested we remand the UFTA causes of action to the trial court.  See, e.g., Reich v. Borough of Fort Lee Zoning Bd. of Adjustment, 414 N.J. Super. 483, 499 n.9 (App. Div. 2010) (declining to address respondent's assertion of error because it was not properly raised by cross-appeal).  Nor has Memorial or plaintiff addressed the UFTA claims in their briefs. We therefore do not discuss the issue in this opinion.

goods store on Market Street. Or how about Falls View, or Libby's? [T]hose names have value here that may not apply somewhere else. And I would only say . . . that although I was very impressed with him, I don't think he was evaluating what the value of Super Supermarket is in that neighborhood, but rather on a nationwide approach.

The judge also found that plaintiff properly attempted to mitigate damages, stating, "[It] found a tenant. And the reason that tenant did not take over . . . was . . . because of the delay that occurred as a result of Mr. Perez's objection." He added: "It was clear that Amma did not want competition. It's evidence[d] by the fact that they objected to Moran Foods. They never attempted to sell their [car wash business] . . . albeit there was only a short amount of time left on the lease."

In a subsequent oral opinion on the record, the judge granted plaintiff's request for counsel fees and costs based on the terms of the lease with Amma. After reducing the number of billable hours to reflect time spent pursuing plaintiff's unsuccessful claims, the court awarded plaintiff $129,943.75 in counsel fees and costs.

II.

Memorial appeals, arguing that the motion judge wrongfully denied summary judgment on the remaining counts of plaintiff's complaint, and the trial judge wrongfully held Memorial liable for Amma's debt under the lease.

12

Memorial contends it could not be liable because Amma did not transfer "substantially all of its assets" to Memorial, a predicate, it says, for finding successor liability. Additionally, Memorial asserts that the trial judge erred in concluding the trademark, "Super Supermarket," had any meaningful value, and, therefore, its transfer from Amma to Memorial could not support a finding that Amma transferred substantial assets to Memorial. Memorial also contends the trial judge erred in concluding plaintiff mitigated its damages and in awarding counsel fees.

We set some guideposts for our consideration of these arguments. Most importantly, our standard of review following a bench trial instructs:

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . . ."
>
> [Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Trust Created By Agreement Dated December 20, 1961, ex. rel. Johnson, 194 N.J. 276, 284 (2008)).]

In reviewing the judge's findings, "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)

13

(alteration in original) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). However, we owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citing State v. Brown, 118 N.J. 595, 604 (1990)); EnviroFinance Grp., LLC v. Env't. Barrier Co., LLC, 440 N.J. Super. 325, 339 (App. Div. 2015).

We have considered Memorial's arguments in light of the record and these applicable legal standards. We reverse.

"[T]he general principle has been accepted in New Jersey that 'where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct.'" Ramirez, 86 N.J. at 340 (emphasis added) (quoting Menacho v. Adamson United Co., 420 F. Supp. 128, 131 (D.N.J. 1976)); see also Stuart L. Pachman, Title 14A Corporations cmt. 5(b)(1) on N.J.S.A. 14A:10 (2021) ("Historically, a corporation purchasing only the assets of another corporation was not liable for the debts and liabilities of the selling corporation.").

> Under this traditional approach, four well-established exceptions exist: where (1) the purchasing corporation expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a

14

continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities.

[Woodrick, 306 N.J. Super. at 73 (citing Ramirez, 86 N.J. at 340).]

As noted above, the trial judge seemingly determined that exceptions two, three and four applied.

Writing for our court in Woodrick, future Justice Virginia A. Long explained what informed an analysis under the second and third exceptions:

In determining whether a particular transaction amounts to a de facto consolidation or mere continuation, most courts consider four factors: (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders.

[Ibid. (quoting Glynwed, Inc. v. Plastimatic, Inc., 869 F. Supp. 265, 275–76 (D.N.J. 1994)).]

The second and third exceptions "tend to overlap, with much of the same evidence being relevant to each determination." Ibid. (citing Glynwed, 869 F. Supp. at 275). In Woodrick, citing numerous "legally relevant factors" in the transferee's acquisition of the transferor's assets in a cash-for-assets purchase, we held "the intent of the asset purchase . . . was to effectuate a merger of the

15

two firms . . . . This . . . resulted in nothing more than a change of hat for [the transferor-debtor.]" Id. at 76–77.

Memorial argues that Amma transferred none of its assets, much less "all its assets," to Memorial. Ramirez, 86 N.J. at 340. According to Memorial, the transfer of a substantial amount of Amma's assets is the sine qua non for finding successor liability. Plaintiff argues, without a single citation in support, that a court may find successor liability without a transfer of substantial assets. It asserts that the judge properly found Memorial was nothing more than a continuation of Amma — the third exception — and that Amma fraudulently transferred assets to avoid its debts — the fourth exception — to the general rule of non-liability.[6]

Here, however, except for the Super Supermarket trademark, there was no evidence, nor did the judge find, that Amma sold or transferred any assets to Memorial. Jeffrey's uncontradicted testimony was that Memorial financed construction of its supermarket and obtained inventory for the new store with a loan financed through General Trading. Plaintiff provided no evidence that any funds in Amma's accounts were transferred to Memorial. The undisputed

---

[6] Plaintiff makes no argument in support of the second exception to the general rule of non-liability, i.e., that there was a de facto merger or consolidation of Memorial and Amma, even though the judge made that finding by clear and convincing evidence. As we explain, the evidence also failed to support that basis for finding successor liability.

testimony was that Amma's fixtures and equipment were essentially worthless and were removed and scrapped by a third party. Perez testified that Amma's inventory was given to its regular customers, and the balance in Amma's lottery account was given to another Perez-owned store, not to Memorial. Amma's liquor license was not transferred to Memorial.

We have found no published New Jersey decision that supports plaintiff's contention that a court may find successor liability in the absence of a sale or transfer of substantial assets by the transferee. In Woodrick, the successor realtor company, Fox & Lazo, purchased the predecessor realtor's "furniture, furnishings, fixtures and equipment[,]" "commissions" due under pending listings, "all pending residential real estate sale contracts[,]" and all of its "customer lists"; Fox & Lazo also "assume[d] certain specified obligations of [the predecessor firm] under office leases, equipment leases and maintenance agreements." 306 N.J. Super. at 69–70. The cases we cited in Woodrick fully support the transfer of all or substantially all assets as a necessary predicate to a finding of successor liability. See Glynwed, 869 F. Supp. at 267–68 (explaining in detail the various transfers of assets, joint production agreement and commonality of ownership that made the defendant company a successor of the original defaulting assignee of a commercial lease); Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc., 13 F.3d 69, 71, 73 (3d

Cir. 1993) (also applying New Jersey law to consider successor liability of the purchaser of predecessor company's assets).

The cases plaintiff cites in its brief only support this essential precondition for successor liability. In Baker v. Nat'l State Bank, successor liability was premised on a merger between the defendant-bank's parent company and another bank that became statutorily liable for the defendant-bank's "obligations and liabilities." 161 N.J. 220, 228 (1999). In Lefever v. K.P. Hovnanian Enters., Inc., the question of successor liability involved a corporation that had purchased the predecessor's assets at a bankruptcy sale. 160 N.J. 307, 310 (1999). In EnviroFinance, the predecessor company owned 100% of the successor company, which "was created for the sole purpose of assuming and succeeding to [the predecessor's] rights with respect to the [environmental mitigation] project" in question. 440 N.J. Super. at 348–49. None of these scenarios even remotely approximate the facts in this case.

"Most jurisdictions hold that a prerequisite to the imposition of liability against a corporation under any of the exceptions to the nonliability of successors is a transfer or sale of all, or substantially all, the assets of the predecessor to the successor." 15 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 7122 (2020) (emphasis added); see also Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1448 (1st Cir. 1995)

(surveying treatises and case law and finding "no mention nor even any hint that the 'mere continuation' or 'de facto merger' [exceptions] might apply in the absence of an asset transfer.").

A sampling of authority from other jurisdictions only supports our conclusion that successor liability is preconditioned on a sale or transfer of substantial assets from the predecessor entity. As the Massachusetts Supreme Judicial Court stated:

> In order for one corporation to be deemed a successor corporation in the first place, it must be a successor to all, or substantially all, of another corporation's assets. In other words, a transfer of assets is an essential prerequisite to successor liability. Our decisions addressing successor liability have recognized consistently that successor liability depends on a transfer of all, or substantially all, assets from predecessor to successor.
>
> [Premier Cap., LLC v. KMZ, Inc., 984 N.E.2d 286, 292 (Mass. 2013) (citations and quotations omitted)].

In Edwards v. Black Twig Mktg. & Commc'ns, LLC, the court rejected the argument that a sale of all or substantially all of a corporation's assets was unnecessary for finding successor liability. 418 S.W.3d 512, 520 (Mo. Ct. App. 2013). The court added:

> We . . . hold that a transfer of all or substantially all of the assets of one corporation to another is a prerequisite to corporate successor liability under any of the four exceptions to the general rule of nonliability . . . . [O]ur cases neither mention nor

19

even hint that the four exceptions might apply in the absence of a transfer of all or substantially all assets. Our holding is also a logical extension of the rule that "[o]rdinarily, the separate legal identities of two corporations will be protected."

[Id. at 521 (alteration in original) (quoting Bank of Belton v. Bogar Farms, Inc., 154 S.W.3d 518, 520 (Mo. App. W.D. 2005)).]

In Evanston Ins. Co. v. Luko, principals of a real estate firm formed a new company because the existing firm was heading for bankruptcy and eventually dissolved. 783 P.2d 293, 295 (Haw. Ct. App. 1989). The new firm was sued for unpaid premiums of the old firm. Ibid. The court held that the new firm was not a successor corporation because there was no transfer of assets. Id. at 296. The court noted that when a corporation has been legally formed, it is a separate and distinct entity, and is not responsible for the debts of another corporation from the mere fact that the former has been organized to succeed the latter. Id. at 295. Moreover, the exceptions to the general rule against successor liability did not apply because there was no sale or transfer of assets. Id. at 296.

As noted, the only asset Amma transferred to Memorial was the trademarked name, "Super Supermarket." Memorial argues the trademark was of de minimis value, as Roche explained, and the judge erred in concluding it had any significant value. According to Memorial, the transfer of the

trademark could not support a finding of successor liability. Plaintiff contends this asset was of significant value and supported the finding of successor liability. We disagree with plaintiff.

Initially, plaintiff offered no evidence as to the actual value of the trademark, and the judge made no findings on the subject. Although the judge accepted Roche's expertise in the subject area, he rejected Roche's opinion that the trademark was only worth $740. Certainly, had the judge accepted Roche's opinion as to value, the transfer of a trademark of such minimal value would be insufficient evidence upon which to premise a finding of successor liability. See, e.g., Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc., 98 F.3d 262, 266 (7th Cir. 1996) (finding that new company was not a successor corporation where the only assets transferred were $700 worth of hand tools).

Particularly as to issues of valuation, "expert testimony is needed [because] the factfinder would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony." Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing Kelly v. Berlin, 300 N.J. Super. 256, 268 (App. Div. 1997)). While the "factfinder is not required to accept an expert's opinion," E & H Steel Corp., v. PSEG Fossil, LLC, 455 N.J. Super. 12, 29 (App. Div. 2018), "even if . . . unrebutted by any other evidence," Torres, 342 N.J. Super at 431, the court's

21

determination of value must be supported by substantial credible evidence. Estate of Cohen ex rel. Perelman v. Boother Computers, 421 N.J. Super. 134, 154 (App. Div. 2011).

In rejecting Roche's opinion, the judge expressed a personal belief that in Paterson, the name Super Supermarket had more than minimal value. He named several other local businesses as evidencing his apparent conclusion that Memorial acquired something of significant value from Amma, i.e., the use of the trade name "Super Supermarket."

However, a judge may not rely on his or her out-of-court personal observations or knowledge in forming an opinion unsupported by any other evidence in the record. Wallington Home Owners Ass'n v. Borough of Wallington, 130 N.J. Super. 461, 465 (App. Div.), aff'd o.b., 66 N.J. 30 (1974). In addition to never assigning a particular value to the trademark, the judge never explicitly found that the transfer of the trademark was sufficient to make Memorial a successor corporation. Other than stating he believed Roche's valuation opinion might be appropriate in other parts of the nation or other parts of New Jersey, the judge never discussed why he rejected the abundance of expert testimony Roche offered, or the fact that other supermarkets in New Jersey were using the same name without any trepidation or concern. The

judge's conclusion that the trademark had more than de minimus value was not supported by substantial credible evidence in the record.

We conclude plaintiff failed to prove Memorial was a successor to Amma and therefore liable for Amma's debt for the unexpired term of the lease. We vacate the judgment, including the award of counsel fees.[7]

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] For the sake of completeness, we reject Memorial's argument that plaintiff failed to mitigate its damages caused by Amma's breach of the lease. The contention lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).