**R. J. ENSTROM CORPORATION, Appellant,**

v.

**INTERCEPTOR CORPORATION and United States of America, Appellees.**

No. 77–1008.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted March 18, 1977.

Decided May 16, 1977.

See also 10 Cir., 520 F.2d 1217.

Clyde A. Muchmore, Oklahoma City, Okl. (Ben L. Burdick, Oklahoma City, Okl., on the brief), Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl. (Phillip D. Bostwick and James Thomas Lenhart, Shaw, Pittman, Potts & Trowbridge, Washington, D. C., on the brief), for appellant.

J. Albert Sebald, Grant, McHendrie, Haines & Crouse, Denver, Colo. (Spradling, Stagner, Alpern & Friot and Stephen P. Friot and George S. Corbyn, Jr., Oklahoma City, Okl., on the brief), for appellee Interceptor Co.

Before LEWIS, Chief Judge, and SETH and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Enstrom Corporation (Enstrom) appeals from an order vacating a prior order which granted a motion for joinder of a limited partnership, Interceptor Company (Interceptor), as a co-defendant pursuant to Fed. Rules Civ.Proc. rule 25(c), 28 U.S.C.A.[1] Jurisdiction on appeal is conferred by 28 U.S.C.A. § 1292(b), in accordance with the District Court's Order. [R., Vol. I, pp. 206, 207.]

Enstrom sued Interceptor Corporation (Corporation), the designer and manufacturer of a single-engine turboprop airplane, known as the Interceptor 400, and the United States of America through the Federal Aviation Administration (FAA) to recover property damage sustained in the crash of Enstrom's Interceptor 400 aircraft on January 15, 1972. The crash occurred following the flameout of the turboprop engine due to fuel starvation. Enstrom alleges that Corporation defectively designed and manufactured the plane's fuel system, that the plane was negligently type-certified by the FAA, and that said conditions existed at the time Enstrom purchased the aircraft.

Nearly three years after this suit was filed, the record attorney for Corporation filed an application for permission to withdraw as its counsel inasmuch as Corporation was "defunct" and without assets. Enstrom then filed a motion pursuant to rule 25(c), *supra*, seeking to join Interceptor as a co-defendant. On August 30, 1976, upon consideration of briefs, the motion for joinder was granted. Thereafter, on motion of Interceptor for an evidentiary hearing challenging its joinder, the Court held the hearing. On December 7, 1976, the Court reversed itself and vacated the prior order of joinder. A recitation of the facts disclosed at the evidentiary hearing follows.

Corporation was organized as a Delaware corporation in 1966 with its principal place of business in Norman, Oklahoma. It was funded by a $300,000.00 stock issue, $80,000.00 of convertible debentures, and a line of credit which reached $300,000.00 with the Bank of the Commonwealth of Detroit, Michigan (Bank). The Bank loan was secured by all of Corporation's assets, including: (1) an FAA certificate authorizing holder to manufacture the Interceptor 400, and (2) tools, jigs and equipment for the manufacture of aircraft, and all future assets. It was further "secured" by certain guarantees executed by the shareholders.

In 1968, Corporation purchased the necessary jigs, dyes, toolings, fittings and parts inventory for the manufacture of the Interceptor 400. In the fall of 1971, Corporation sold its first plane to Enstrom. Soon thereafter, Ted Malpass (Malpass) was elected president of the Corporation. In January, 1972, the airplane crash which involves our concern here occurred. In March of that year, Corporation was in need of additional funds to build its second Interceptor 400. Stanley S. Kresge (Kresge) loaned it $300,000.00. In consideration, Kresge received a promissory note secured by a second lien applicable to Corporation's assets.

In November of 1972, Enstrom filed this suit. At that time, Corporation was unable to pay the rental on the building it was leasing for manufacturing purposes. The landlord was "putting on pressure." The Detroit Bank was also threatening foreclosure. In December, Malpass, who had invested $143,000.00 in the Corporation, suggested that a partnership of interested Corporation shareholders be formed to purchase the Bank note which then bore an

1. Fed.Rules Civ.Proc. rule 25(c), 28 U.S.C.A.:

In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. . . .

unpaid principal balance of $100,000.00, together with accrued interest. Each shareholder of Corporation was invited to join in the formation of the partnership and the purchase of the note. A limited partnership was thereafter formed, comprised of six stockholders of Corporation. The Bank note was purchased in February, 1973. Malpass and Peter Luce (Luce) contributed the major portion of the funds required for this purchase. The other four contributing stockholders became members of the limited partnership. They contributed a smaller portion toward purchase of the Bank note. During 1973 and extending to the summer of 1974, Malpass and Luce traveled throughout the country displaying and demonstrating the Interceptor 400 in efforts to sell it. Luce finally purchased this plane so that the demonstration efforts could continue. In addition, during this period the Corporation received loans of $50,000.00 from Luce and $3,000.00 from Malpass. At about this time, the landlord of Corporation's manufacturing building threatened eviction because of repeated delays in rental payments. Thereafter, Interceptor took possession of Corporation's assets in Norman, Oklahoma, and transferred them to Boulder, Colorado.

Proper notice was sent to the Corporation's shareholders of a special meeting to be held on June 19, 1974. The only shareholders who attended this meeting were the six partners in Interceptor. A resolution was adopted at this meeting which provides that all of Corporation's assets were to be transferred to Interceptor in return for the cancellation of the note acquired by Interceptor. This was to be accomplished pursuant to 12A Okla.Statute Anno. § 9–505, the Uniform Commercial Code (U.C.C.).[2] In accordance therewith, duly executed written notices of the proposed transfer were submitted to Corporation's secured creditors pursuant to § 1–201(26) U.C.C. This would be, in effect, what is commonly referred to as a "bulk" sale or transfer. One of the junior secured creditors, Don Long, objected. Long was thus advantaging himself of § 9–505 of the U.C.C. which compels a sale of the assets as provided under § 9–504 of the U.C.C.[3]

In compliance with § 9–504, *supra*, notice (pursuant to § 1–201(26) U.C.C.) was sent to Corporation and Corporation's secured creditors of the proposed public sale. A notice

**2.** 12A Okla.Statutes Anno. § 9–505:

   (2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. If the debtor or other person entitled to receive notification objects in writing within [twenty] days from the receipt of the notification or if any other secured party objects in writing within thirty days after the secured party obtains possession the secured party must dispose of the collateral under Section 9–504. . . .

**3.** 12A Okla.Statutes Anno. § 9–504:

   (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

   *   *   *   *   *   *

   (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, except in the case of consumer goods and to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

was also published three times in *The Denver Post.* On October 12, 1974, the public sale was conducted pursuant to § 9–504, *supra.* No bids were placed except that of Interceptor. It, of course, purchased the assets in exchange for cancellation of the note which it held against Corporation.

On November 13, 1974, Interceptor filed an application for the formation and qualification of a partnership under the laws of Colorado. One of its stated purposes was that of manufacturing aircraft. On December 31, 1974, Interceptor received an FAA certificate authorizing it to manufacture the Interceptor 400.

At the time of the proceedings before the district court in the instant case, Interceptor did not have personnel certified by the FAA to build an airplane, nor did it have a manufacturing facility. Its assets were stored in an unheated warehouse which was without electricity or bathrooms. Interceptor did sell some spare parts for the "200" airplane, a single-engine turboprop which flies at a lower altitude than the Interceptor 400. When Corporation purchased the right to manufacture the Interceptor 400, the manufacturing tools and equipment which it acquired were capable of and did in fact manufacture parts which are interchangeable between the "200" airplane and Interceptor 400. Another company had previously manufactured and sold a number of the "200" airplanes.

The trial court found that: "There was no transfer of interest in this case between the INTERCEPTOR CORPORATION and the INTERCEPTOR COMPANY for purposes of Rule 25(c), Fed.R.Civ.P. . . . Because the INTERCEPTOR COMPANY obtained the assets of the INTERCEPTOR CORPORATION at a public foreclosure sale held pursuant to the Uniform Commercial Code, the INTERCEPTOR COMPANY is not, as a matter of law, a continuation of the INTERCEPTOR CORPORATION." [R., Vol. I, p. 206.]

On appeal, Enstrom contends that the trial court erred in holding that Interceptor was not joinable as a co-defendant under Fed.Rules Civ.Proc. rule 25(c), 28 U.S.C.A.

in that Interceptor (the purchasing company) is merely a continuation of Corporation (the selling corporation) thus rendering Interceptor liable for Corporation's debts. Enstrom relies on *West Texas Refining & Development Co. v. Commissioner of Internal Revenue,* 68 F.2d 77 (10th Cir. 1933), for this proposition.

### I.

It is within the trial court's sound discretion to substitute parties when some act has affected the capacity of a named party to be sued. *United States v. F. D. Rich Company,* 437 F.2d 549 (9th Cir. 1970), *cert. denied,* 404 U.S. 823, 92 S.Ct. 48, 30 L.Ed.2d 51; *Brown v. Keller,* 274 F.2d 779 (6th Cir. 1960). Accordingly, the trial court's order denying joinder of Interceptor as a party defendant will not be disturbed on appeal unless Enstrom has demonstrated an abuse of discretion. *United States v. 79.95 Acres of Land, etc., Rogers County, Oklahoma,* 459 F.2d 185 (10th Cir. 1972).

Enstrom argues that the trial court's order is clearly erroneous inasmuch as Interceptor is simply a continuation of Corporation and that Interceptor thus falls into an exception to the general rule of non-liability. We recognized the general rule and its exceptions in *West Texas Refinery & Development Co. v. Commissioner of Internal Revenue, supra*:

The general rule is that where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor . . .

To this general rule there are four well recognized exceptions, under which the purchasing corporation becomes liable for the debts and liabilities of the selling corporation: (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudu-

lently in order to escape liability for such debts. . . .

68 F.2d, at 81.

*Accord*: *Golden State Bottling Co. v. N.L. R.B.*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973).

Enstrom urges that Interceptor is a continuation of Corporation in that Interceptor's only assets are those it received from Corporation and because, following the transfer, Corporation was without any assets. The transfer of assets by reason of the public sale, did, of course, render Corporation defunct. Corporation has not dissolved, however, because it has not paid its delinquent taxes, a prerequisite to dissolution. Enstrom further urges acceptance of its "continuation" theory in that (a) the active stockholders, directors and officers of Corporation are the same individuals who own, control and manage Interceptor, (b) both seller and purchaser employ the word "Interceptor" in their business names, and (c) one of Interceptor's business purposes, stated in the limited partnership agreement, is that of manufacturing Interceptor airplanes, a purpose identical to that of Corporation.

■ The trial court's finding that Interceptor is not a continuation of Corporation involves a question of state law. If there are no controlling state precedents, the resident federal district judge's interpretation and/or application of state law must be given extraordinary force on appeal. *United States v. Hunt*, 513 F.2d 129 (10th Cir. 1975); *United States v. Wyoming National Bank of Casper*, 505 F.2d 1064 (10th Cir. 1974).

Enstrom further urges that we reverse the trial court's finding and/or conclusion that a public sale in compliance with § 9–504 U.C.C. precludes a finding of continuation. A review of pertinent facts and circumstances reflected in the record may aid in the resolution of Enstrom's contention.

■ Interceptor is not a manufacturing company; its assets are stored in a warehouse facility; manufacturing by Interceptor is impossible in that there is no heat, electricity, or toilet facilities in its warehouse; it has no employees who are certified by the FAA to build the airplane; its activities are limited to selling spare parts from its surplus for the "200" airplanes previously manufactured by another company, *supra*, and in efforts to sell the idea and assets necessary for production of the Interceptor 400. Corporation, not Interceptor, was involved in the production of the Interceptor 400. Interceptor purchased the assets of Corporation at a public or "forced" sale after the secured creditors and general public had been given proper notice of the sale. No bid other than that of Interceptor was received, and that bid price was bona fide. These facts effectively negate a conclusion that Interceptor was a continuation of Corporation. *West Texas Refinery & Development Co. v. Commissioner of Internal Revenue, supra.*

Enstrom cites *Wiggins Ferry Co. v. O. & M. Railway*, 142 U.S. 396, 12 S.Ct. 188, 35 L.Ed. 1055 (1892) in support of its contention that the public sale had no effect on the determination of whether Interceptor was a continuation of Corporation. *Wiggins* is not controlling. In that case the purchasing corporation impliedly reaffirmed and assumed an old obligation of the selling corporation by the continued use of a ferry. Interceptor did not expressly or impliedly reaffirm or assume any obligation of Corporation. The members of Interceptor purchased Corporation's loan from Bank after Bank had threatened foreclosure. All of Corporation's shareholders were notified of these facts and invited to purchase the loan through Interceptor. Interceptor did not assume possession of Corporation's assets which had been given as security for the loan until after Corporation's landlord threatened eviction. Thereafter, Interceptor notified Corporation's stockholders of an offer to cancel the loan in exchange for possession of the assets. The stockholders approved the offer. The secured creditors were then given actual notice of the transfer pursuant to § 9–505 U.C.C. After Don Long, a secured creditor, objected, the public sale followed. Under these circumstances, we hold that Interceptor's purchase of

the assets for the amount of the loan was arms-length and in nowise inequitable or overreaching.

We held in *Monroe v. Scofield*, 135 F.2d 725 (10th Cir. 1943) that:

> According to the practically uniform opinions of the courts, a corporation may, although insolvent, secure an officer or stockholder for a contemporaneous loan made to it fairly and in good faith . .

135 F.2d at 726.

The facts and circumstances here lead to the conclusion that Interceptor's dealings were indeed and in fact good faith efforts to keep Corporation alive and productive. This is the more compelling in light of the additional efforts and investments made by the members of Interceptor after the Bank loan was obtained. At the time of the public sale, the partners of Interceptor were at arms-length with the Corporation in terms of the Bank loan.

The procedure employed in the sale is further proof that Interceptor treated Corporation at arms-length. The notice, manner, and procedure of the sale were in all respects conducted pursuant to § 9–504 U.C.C. The public sale benefited Corporation by reason of cancellation of the loan. There is no evidence of overreaching or lack of good faith. The statutory procedure employed in the public sale of Corporation's assets insured that no rights were prejudiced.

A director is authorized to make loans to his corporation. *Monroe, supra.* He is also as entitled to foreclose upon default in the repayment of that loan just as any other secured creditor. *McKee v. Interstate Oil & Gas Co.*, 77 Okl. 260, 188 P. 109 (1920). Lacking proof of overreaching or lack of good faith, directors, officers or stockholders who foreclose against collateral by reason of a defaulted corporate loan do not violate any duty owing to the corporation or interested party.

WE AFFIRM.