**GLYNWED, INC., Plaintiff,**

v.

**PLASTIMATIC, INC., Danco Products, Inc., and Danco/Plastock, Inc., Defendants.**

**Civ. A. No. 92–1500 (WGB).**

United States District Court,
D. New Jersey.

Nov. 9, 1994.

Tompkins, McGuire & Wachenfeld, Newark, NJ by William J. Prout, for plaintiff.

Pitney, Hardin, Kipp & Szuch, Morristown, NJ by Frederick L. Whitmer, for Danco/Plastock, Inc.

## OPINION

BASSLER, District Judge:

Plaintiff Glynwed, Inc. ("Glynwed") and defendant Danco/Plastock, Inc. ("Danco/Plastock") have filed cross-motions for summary judgement. Glynwed seeks a determination that Danco/Plastock is the corporate successor of defendants Plastimatic, Inc. ("Plastimatic") and Danco Products, Inc. ("Danco"). Danco/Plastock argues that it cannot, as a matter of law, be the corporate successor of those corporations. For the reasons set forth below, the Court finds that Danco/Plastock is the corporate successor of Plastimatic and Danco.

## I. BACKGROUND

### A. Facts

This action arises out of a ten year commercial lease agreement between plaintiff Glynwed and Milsay Associates ("Milsay") for the lease of a portion of a multi-tenancy building in Fairfield, New Jersey. The lease commenced August 1, 1986 and was to end July 31, 1996.

In December of 1989, Glynwed assigned all of its interest in the lease to Roplac, Inc. ("Roplac") when Glynwed and Roplac entered into an Agreement for Purchase and Sale of Assets. Milsay consented to the Assignment and Assumption. In April of 1990, Roplac changed its name to Plastimatic, Inc., one of the defendants herein.

In December of 1990, Rostra Holdings ("Rostra Holdings"), whose principals were Walter Rose (Chairman of the Board of Plastimatic), John Strautnieks (Secretary and member of the Board of Plastimatic), and Donn Hartley (Vice President and member of the Board of Plastimatic), solicited opportunities to acquire another plastic injection molding company. Rostra Holdings sent a letter to Gregory Goulette, President and sole shareholder in Danco, defendant herein, an injection molding company in Connecticut. Goulette contacted Hartley, and in January through March of 1991, the two men planned the consolidation of Danco and Plastimatic. Rose, Hartley and Strautnieks, the principals of Plastimatic, formed a company called Rostra Danco, Inc. ("Rostra Danco")

to purchase the stock of Danco Products, and on March 8, 1991, Rostra Danco acquired 100% of Danco's stock from Goulette in exchange for 10% of Rostra Danco's stock.

The Rostra Danco principals decided to abandon Plastimatic's New Jersey facility and physically consolidate Danco and Plastimatic at Danco's Connecticut facility. Sometime in early June of 1991, Plastimatic took all of its assets and left the leased premises without notice to either Glynwed, the lessee/assignor, or Milsay, the lessor. Plastimatic left its New Jersey facility and entered into a joint production agreement with Danco's Connecticut plant. Plastimatic ceased paying rent to Milsay effective June of 1991, despite demands from Milsay and Glynwed, with approximately five years remaining on the lease.

After the move to Connecticut, Danco and Plastimatic essentially operated as one entity. Rostra Danco prepared single reports for shareholders, referring to the company as "Danco/Plastimatic." The two companies kept their own identities for accounting and legal purposes, however.

On July 29, 1991, Plastimatic and its secured lender, the Connecticut National Bank ("CNB"), entered into a Forbearance Agreement which expired on December 31, 1991. Plastimatic was in default under the terms of the original finance agreements and the Forbearance Agreement, and, by letter dated February 11, 1992, CNB demanded full payment.

On October 17, 1991, Danco's secured lender, Fleet National Bank ("Fleet"), advised Danco that it considered Danco in default because, as required by the loan agreement, Danco had failed to show a profit in the prior six months and had failed to provide Fleet with a $60,000 cash collateral reserve. On December 31, 1991 Fleet and Danco reached a Forbearance Agreement by which Danco agreed that all of its obligations to Fleet would become due and payable in full on March 31, 1992. Danco was only able to pay $5,000 of the $31,000 installment it owed Fleet at the termination of the Agreement. Danco was in default under the terms of the finance agreement and the Forbearance

Agreement and, by letter dated May 22, 1992, Fleet demanded full payment.

Plastimatic and Danco negotiated with Fleet and CNB, from at least February of 1992, to have a new corporation, Danco/Plastock, purchase the assets of Plastimatic and Danco at a secured party sale pursuant to section 9–504 of the Uniform Commercial Code ("UCC"). Plastimatic and Danco agreed to turn over their assets to CNB and Fleet for sale at a secured party sale. The sale was conducted on June 12, 1992 by Thomas Industries of New Haven, Connecticut. Prior to the sale, Thomas Industries notified over 700 prospective purchasers of the sale by direct mail and placed advertisements in industry trade journals. Danco and Plastimatic also mailed notices of the sale to all of their creditors, including Glynwed and Milsay. Thomas Industries valued the collateral and determined that the minimum bid should be $1,850,000.

As planned, on May 29, 1992 Rose, Hartley, and Strautnieks formed a new corporation, Danco/Plastock, to bid on the assets of Danco and Plastimatic at the secured party sale. Danco/Plastock was capitalized with $500,000 in unsecured loans, convertible into 50% of the corporation's common stock, and a secured loan of $590,000 and rent concessions from the landlord of Danco/Plastimatic's facility. Danco/Plastock also obtained debt financing from CNB, Plastimatic's secured lender, in the form of a revolving loan of up to $1,000,000.

Of the two bidders which appeared at the sale on June 12, 1992, Danco/Plastock was the only one that actually placed a bid. Danco/Plastock's bid of $1,687,369.40 was accepted by the creditors, and Danco/Plastock purchased the assets of Danco and Plastimatic by Secured Party Bills of Sale.

## B. *Procedural History*

Glynwed filed a complaint for declaratory relief on April 10, 1992, prior to the sale, against Plastimatic and Danco, seeking declarations as to their payment obligations under the lease and for repair of the premises. On

or around June 29, 1992, Glynwed's counsel received a letter from counsel for Plastimatic and Danco which indicated that both defendants' assets had been sold at the secured party sale and that counsel had been directed not to defend the matter further.

On July 14, 1992, this Court issued an *ex parte* temporary restraining order against Plastimatic and Danco, restraining them from transferring or liquidating their assets. On July 16, a second *ex parte* order was issued against Danco/Plastock, restraining it from transferring any of its assets pending a show cause hearing. This order was amended by agreement of the parties to allow Danco/Plastock to conduct its day-to-day business. The show cause hearing was held before this Court on September 15, 1992, at which time Danco/Plastock had neither been served with process nor added as a party-defendant to this action. On September 16, the Court denied Glynwed's application for a preliminary injunction against Danco/Plastock, and dissolved the temporary restraints against Danco/Plastock, Danco, and Plastimatic.

Glynwed then sought leave to amend its complaint to name Danco/Plastock as a defendant on the theories that Danco/Plastock is a successor-in-interest to Plastimatic and Danco and that the transfer of assets to Danco/Plastock was a fraudulent conveyance. Danco/Plastock argued before Magistrate Judge Hedges that it should not be so joined because this Court lacked *in personam* jurisdiction over it. Judge Hedges considered Danco/Plastock's arguments, and in a letter-opinion and order of October 27, 1992 decided that *in personam* jurisdiction over Danco/Plastock did exist. This Court subsequently found that Judge Hedges' decision was neither clearly erroneous nor contrary to law, and therefore denied Danco/Plastock's appeal of Judge Hedges' order.

On May 6, 1993 Magistrate Judge Cavanaugh granted plaintiff's motion for default judgment pursuant to Rule 55(b). Judge Cavanaugh recommended to this Court (i) that default be entered against Danco in the amount of $1,362,268.59,[1] (ii) that a declarato-

---

1. Plaintiff's amended complaint alleged that Plastimatic and Danco merged in 1991. The

default judgment entered against Danco was for rent owed under the lease plus expenses provid-

ry judgment be entered against Plastimatic declaring that Plastimatic is in breach of the Assignment and Assumption of Lease Agreement with Glynwed, and liable for any and all sums which are or may be due resulting from that breach,[2] and (iii) that plaintiff's request for punitive damages be denied. On July 16, 1993 this Court adopted Judge Cavanaugh's Report and Recommendation.

In March of 1994, Glynwed and Danco/Plastock filed cross-motions for summary judgment. On June 13, 1994 the Court heard oral argument on the cross-motions. Based on the written submissions of the parties and the oral argument of counsel, the Court, for the reasons set forth below, will grant Glynwed's motion for summary judgment on the issue of successor liability with respect to the de facto consolidation/mere continuation theory; Glynwed's motion for summary judgment on all other theories of successor liability will be denied. Danco/Plastock's cross-motion for summary judgment on the theory that UCC section 9–504 precludes a finding of successor liability for the commercial debt of an alleged predecessor corporation will also be denied.

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In determining whether there remain any genuine issues of material fact, the court must resolve all reasonable doubt in favor of the nonmoving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d

Cir.1983); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Under the standards announced by the Supreme Court's trilogy in *Celotex Corp v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). Indeed, where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *Id.* at 248, 106 S.Ct. at 2510. Thus, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence that will reasonably support a jury verdict in its favor, *id.* at 249, 106 S.Ct. at 2510; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring), and not just "some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355.

■ Moreover, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted."

---

ed for in the lease. *See* Report and Recommendation of Hon. Dennis M. Cavanaugh, filed May 6, 1993, and Letter Order Amending Report and Recommendation, filed May 10, 1993.

2. Judge Cavanaugh's Report and Recommendation provided that "an evidentiary hearing will be necessary if and when plaintiff moves to collect on the Declaratory Judgment." Report and Recommendation of Hon. Dennis M. Cavanaugh, filed May 6, 1993, at 5.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 860 (3d Cir.1990).

### B. *Choice of Law*

Danco/Plastock asserts that Connecticut law applies; Glynwed claims that New Jersey law applies. Neither party provides a helpful discussion of the issue. Danco/Plastock argues that the "law of the state where the collateral is located should be the governing law, without regard to possible contacts in other jurisdictions." Danco/Plastock Br. in Opp. at 9. Danco/Plastock fails to realize that this case involves claims of breach of contract, fraud, and successor liability. A federal court sitting in diversity must apply the conflict of laws principles of the forum state, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), here, New Jersey.

In contract suits, New Jersey follows the Restatement (Second) of Conflict of Laws § 188 (1971), which looks to the jurisdiction having the most significant relation and closest contacts with the transaction and the parties. *State Farm Mutual Auto. Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 34, 417 A.2d 488 (1980); *Kaufman v. Provident Life and Cas. Ins. Co.,* 828 F.Supp. 275, 282 n. 10 (D.N.J.1992), *aff'd,* 993 F.2d 877 (3d Cir. 1993); *Pancza v. Remco Baby, Inc.,* 761 F.Supp. 1164, 1168 (D.N.J.1991). Regarding Glynwed's breach of contract claim and successor liability claims, the relevant contacts are as follows: Plastimatic maintained a manufacturing facility in New Jersey; Glynwed's principal place of business was in New Jersey; the assignment and assumption of the lease was executed in New Jersey; the leasehold property was and is in New Jersey; the plaintiff's principal place of business remains in New Jersey; defendant is a Connecticut corporation with its principal place of business in Connecticut; the foreclosure sale took place in Connecticut. Given the above, New Jersey clearly has the most significant relationship with the transaction and the parties.

Even though the Court finds that New Jersey law applies, however, the Court notes that except in the strict products liability context, which is not at issue here, the law on successor liability is similar in both states and, indeed, throughout the country. *Luxliner P.L. Export v. RDI Luxliner,* 13 F.3d 69, 74 n. 5 (3d Cir.1993) (" 'The laws pertaining to [this] issue are basically uniform throughout the country.' ") (citation omitted). This similarity is in fact another reason to apply the laws of New Jersey. *See Menacho v. Adamson United Co.,* 420 F.Supp. 128, 130 (D.N.J.1976) (citation omitted). The Court will, however, look to cases from both (and other) jurisdictions in examining the issues presented.

In tort cases, such as Glynwed's fraud claim, New Jersey has adopted a governmental interest analysis regarding choice-of-law questions. *State v. Curry,* 109 N.J. 1, 7, 532 A.2d 721 (1987); *Veazey v. Doremus,* 103 N.J. 244, 248, 510 A.2d 1187 (1986); *Bussell v. DeWalt Products Corp.,* 259 N.J.Super. 499, 513, 614 A.2d 622 (1992); *Pancza,* 761 F.Supp. at 1168. The first question that the Court must ask under this approach is whether there is actually a conflict between the laws of the interested states. *Id.* The parties have not pressed any conflict between the laws of New Jersey and Connecticut, and the Court does not find any. Therefore, New Jersey law will apply.

### C. *Successor Liability*

Glynwed argues that Danco/Plastock is liable for Plastimatic's breach of the lease agreement because Danco/Plastock is the corporate successor to Plastimatic and Danco. Glynwed offers three bases for Danco/Plastock's successor liability: (i) Danco/Plastock impliedly assumed Plastimatic's debt to Glynwed; (ii) Danco/Plastock is merely a continuation of Plastimatic and Danco and/or Danco/Plastock effected a de facto consolidation of Plastimatic and Danco; and (iii) the secured-party sale to Danco/Plastock was fraudulent.

It is well settled that "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." Fletcher Cyc. Corp. § 7122 (Perm.Ed.1990) ("Fletcher"). There are well-settled exceptions to the general rule, however, and the purchasing corporation may be liable for the debts of the predecessor where (i) there is an express or implied agreement "to assume the other company's debts and obligations"; (ii) the "purchasing company was a mere continuation of the selling company"; (iii) there "was a de facto consolidation or merger of the corporations"; or (iv) the transaction was fraudulent. *Id.* Here, Glynwed argues that Danco/Plastock's acquisition of the assets of Plastimatic and Danco comes within the established exceptions.

Before turning to the merits of the individual exceptions argued by the parties, the Court must address two general attacks Danco/Plastock has levelled upon Glynwed's successor liability argument. Danco/Plastock argues that even if its acquisition comes within any of the exceptions to the general rule, it still cannot be liable because (i) this case involves purely commercial debt and not, e.g., products liability or environmental contamination, and (ii) it acquired the assets pursuant to a validly conducted foreclosure sale under section 9–504 of the UCC. For these reasons, Danco/Plastock contends that it is entitled to summary judgment.

### 1. *Scope of Successor Liability*

Danco/Plastock's first argument is that the exceptions to the general rule of non-liability do not apply in the context of the purely commercial debt of an alleged predecessor corporation. According to Danco/Plastock, even if a transferee corporation would otherwise be, e.g., a "mere continuation" of a transferor corporation, the transferee will not be liable for the purely commercial debts owed to the unsecured creditors of the transferor, although it would be liable for, e.g., injuries resulting from defective products, damage caused by environmental contamination, and other claims where public policy requires imposing liability on the transferee.

Danco/Plastock's argument misses the mark. Indeed, the exceptions to the general rule of non-liability discussed above developed not in response to tort and environmental claims but in part through cases involving claims for commercial debt against successor corporations. *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 341, 431 A.2d 811 (1981) (providing that the traditional rule of non-liability and the exceptions thereto developed "to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor") (citations omitted); *Polius v. Clark Equipment Co.*, 802 F.2d 75, 78 (3d Cir.1986) ("The successor rule was designed for the corporate contractual world where it functions well. It protects creditors and dissenting shareholders, and facilitates determination of tax responsibilities, while promoting free alienability of business assets.... However, when the form of the transfer does not accurately portray substance, the courts will not refrain from deciding that the new organization is simply the older one in another guise."); *see also* 19 Am.Jur.2d, Corporations § 2715 (1986) (under merger and consolidation exceptions, successor corporation is liable for the "debts and contracts" of the predecessor "whether they arise ex contractu or ex delicto"); *id.* at § 2719 (successor liability imposed under de facto merger exception "in cases involving such matters as a workers' compensation award, a breach of contract, insurance fraud, liability for environmental damage, and creditor claims generally") (footnotes omitted).

In *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 311–12 (3d Cir.1985), the defendant, like defendant here, argued that "courts, in determining whether successor liability is appropriate, will first look to see whether the same social policy considerations underlying strict products liability are thereby promoted." *Id.* In finding that defendant's contention was "entirely without merit," the Court stressed that "the de facto merger doctrine is supported by 'social policy considerations' independent of any particular cause of action." *Id.* (citations omitted).

It was because the traditional common law categories were considered too narrow in the strict products liability and labor law areas that the New Jersey courts, among others, have created broader exceptions in those areas. *Ramirez*, 86 N.J. at 340–343, 431 A.2d 811; *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). But the traditional exceptions continue to be applicable to various other areas, including claims for commercial debt, such as the breach of contract claim in this case. *See, e.g., Luxliner*, 13 F.3d at 73 & n. 2 (discussing de facto merger and mere continuation exceptions in context of attempt by plaintiff to impose successor liability regarding breach of contract claim for which it had obtained default judgment against alleged predecessor; the Court noted that expansion of successor liability in area of strict products liability did not disturb common law standards in any other context); *Philadelphia Elec.*, 762 F.2d at 311–12 (expansion of successor liability in products area does "not in any way limit[ ] the scope of the established exceptions"); *Ramirez*, 86 N.J. at 341, 431 A.2d 811; *Arnold Graphics Indus. v. Independent Agent Ctr.*, 775 F.2d 38, 42 (2d Cir.1985) (applying de facto merger exception and affirming district court's decision that successor was liable for debts of predecessor) (citing *Hoche Productions v. Jayark Films Corp.*, 256 F.Supp. 291 (S.D.N.Y. 1966)); *Allen Morris Commercial Real Estate Serv. Co. v. Numismatic Collectors Guild, Inc.*, 1993 WL 183771 (S.D.N.Y.1993) (on plaintiff's motion for summary judgment, court held successor liable for predecessor's breach of lease agreement on de facto merger and mere continuation theories); *Marenyi v. Packard Press Corp.*, 1994 WL 533275 (S.D.N.Y.1994) (applying successor liability exceptions to breach of contract claim); *Na-*

*tional Grange Mutual Ins. Co. v. Montgomery Elevator*, 1994 WL 547747 (Conn.Super.Ct.1994) (explicitly adopting exceptions to general rule of non-liability in context of commercial debt claim); *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, 756 F.Supp. 126, 132–33 (S.D.N.Y.1991) (explicitly applying exceptions to breach of contract by alleged predecessor) (applying Maryland law); *Ricciardello v. J.W. Gant & Co.*, 717 F.Supp. 56, 57–59 (D.Conn.1989) (stating general rule and exceptions and applying certain exceptions to securities violations); *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1534–36 (D.C.N.Y.1985) (plaintiff stated successor liability claim against defendant for commercial debts of predecessor); *Hoche Productions*, 256 F.Supp. at 295–96 (defendant corporation held liable for contract obligations of predecessor on implied assumption of liability and de facto merger theories) (citing Fletcher, *supra*, § 7122).

This is clearly the common law rule, and Danco/Plastock provides no authority for its assertions, which are contrary to the authorities cited above, that the rule is any different in either New Jersey or Connecticut. Indeed, Danco/Plastock provides no authority from any jurisdiction supporting its claim that successor liability does not apply to hold a transferee corporation, which would otherwise fall within one of the exceptions, liable for the breach of contract of the transferor; this Court declines the implied invitation to be the first to so find. Thus, Danco/Plastock's motion for summary judgment on this ground must be denied.

### 2. *Successor Liability and Section 9–504*

■ Danco/Plastock's second argument is, in essence, that a purchasing corporation can never be exposed to corporate successor liability for commercial debt where it acquires the assets pursuant to a foreclosure sale under section 9–504 of the UCC.[3] Dan-

---

3. Section 9–504, entitled "[s]ecured party's right to dispose of collateral after default; effect of disposition," provides as follows:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral[.] ...

(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this subchapter or of any judicial proceedings.

N.J.S.A. § 12A:9–504.

co/Plastock argues that if all of the requirements of section 9–504 were met, then Danco/Plastock could not have acquired any of the debts of Plastimatic or Danco, regardless of whether Danco/Plastock's acquisition of those companies would otherwise fit within any of the exceptions to the general rule of non-liability.[4] The issue presented, then, is whether a bank's sale of collateral under a secured agreement pursuant to section 9–504 permits the purchaser not only to take the assets free of any security interest in the collateral but also precludes any claim of successor liability being asserted against the purchasing corporation.

Danco/Plastock argues that "[b]ecause Glynwed had no interest in the assets when they were in the hands of Fleet and CNB, they can have no interest in the assets now that they are in the hands of Danco/Plastock." Danco/Plastock Br. in Opp. at 17. Throughout its briefs, Danco/Plastock cites three cases in support of its argument: *Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277 (10th Cir.1977) ("*Enstrom*"); *Liqui\*Lawn Corp. v. The Andersons*, 31 Ohio St.3d 145, 148, 31 OBR 312, 314, 509 N.E.2d 1236, 1239 (1987) ("*Liqui\*Lawn*"); and *Personal Jet, Inc. v. Callihan*, 624 F.2d 562 (5th Cir.1980) ("*Personal Jet*").

In *Enstrom*, plaintiff sued defendant Interceptor on a "mere continuation" theory following Interceptor's purchase of an alleged predecessor corporation's assets at a validly conducted 9–504 sale. One element of the mere continuation theory is a showing by the plaintiff that the alleged successor has continued the enterprise of the seller's general business operations. In finding that the plaintiff failed to establish successor liability, the Court first emphasized that (i) Interceptor did not conduct, and was wholly incapable of conducting, the business of the seller; (ii) unlike the seller, Interceptor was not even a manufacturing company; and (iii) Interceptor employed no employees certified to do

the work of the seller. The Court then stated that the buyer purchased the assets at a 9–504 sale. The Court concluded that "[t]hese facts effectively negate a conclusion that Interceptor was a continuation of" the seller. *Enstrom*, 555 F.2d at 282.

The *Enstrom* Court did not consider the secured-party sale to be an absolute bar against a finding of successor liability. If it had, the Court would not have needed to analyze and compare the business practices of the buyer and seller, an inquiry very relevant to the mere continuation exception. Thus, *Enstrom* does not stand for the proposition for which it is cited by Danco/Plastock.

*Liqui\*Lawn* involved a situation where plaintiff, Liqui\*Lawn, a purchaser of collateral at a 9–504 sale, sued defendant, one of the seller's unsecured creditors (The Andersons, a partnership), for breaching a licensing agreement. Defendant argued that the debt owed to it by the seller should be set off against any damages it owed to plaintiff Liqui\*Lawn. Defendant argued that Liqui\*Lawn was liable for the debt of the seller as its assignee. The Court rejected this argument, finding that Liqui\*Lawn took the collateral/licensing agreement free of all interests of subordinate creditors in that collateral. 509 N.E.2d at 1238–39.

*Liqui\*Lawn* is distinguishable from this case, and does not stand for the proposition for which it is cited by Danco/Plastock. Significantly, there was no claim of successor liability in *Liqui\*Lawn*. Thus, the Court was not presented with the issue now before this Court.

Moreover, as Glynwed points out, Glynwed, unlike the defendant in *Liqui\*Lawn*, is not asserting an interest in the collateral purchased at the 9–504 sale, but is attempting to hold Danco/Plastock liable as a successor corporation under the law of successor liability. Despite Danco/Plastock's predictions of the gloom and doom that will de-

---

4. Danco/Plastock also argues that it does not fit within the specific exceptions argued by Glynwed, in part based upon the manner in which it acquired the assets. The manner in which an alleged successor corporation was capitalized and purchased the assets of the alleged predecessor is relevant under a number of the exceptions,

and Danco/Plastock's arguments in this regard will be considered within the discussion of the applicability of the individual exceptions. Here, the Court considers Danco/Plastock's separate argument that the exceptions should not even be considered because section 9–504 precludes a finding of successor liability.

**274**

scend upon the area of commercial law if the Court permits Glynwed to proceed on its theory, nothing in the UCC supports Danco/Plastock's argument that the 9–504 sale provides a safe harbor against successor liability claims. Glynwed is not looking to enforce a lien on the assets that Danco/Plastock purchased at the foreclosure sale, but is asserting a claim of successor liability. Contrary to Danco/Plastock's assertions, this is a distinction with a difference.

In *Personal Jet*, Callihan obtained a judgment against Paris Jet, a corporation for which he located planes but was not paid his commission. Callihan attempted to enforce his judgment against the planes he acquired for Paris Jet, but found that they had been repossessed by the corporation's secured lender and sold to Personal Jet, a corporation owned by a 24.5% owner of Paris Jet. Callihan argued that the transfers should be set aside, resulting in title revesting in Paris Jet subject to execution by him. The Court found that the sale by the bank to a third-party (IMA) upon the debtor's default satisfied the requirements of article nine of the UCC, and that IMA obtained good title that it properly transferred to Personal Jet. Thus, the Court refused to set aside the transfers, and concluded that Callihan "could not enforce his judgment against Paris Jet against this collateral owned by Personal Jet."

Like *Liqui*Lawn*, *Personal Jet* is distinguishable from this case and does not stand for the proposition cited by Danco/Plastock. Again, Callihan was not attempting to hold Personal Jet liable as the successor corporation of Paris Jet and, given the facts in the case, could not possibly have done so. Callihan had obtained a judgment against Paris Jet and was trying to enforce it on collateral that once belonged to Paris Jet by arguing that Paris Jet's transfer of the collateral was fraudulent and commercially unreasonable. Finding no reason to set aside the transfers, the Court found that Callihan could not execute against collateral now owned by Personal Jet. Although this case is clearly on point regarding Glynwed's claims of fraud and commercial unreasonableness, it simply does not address the issue of whether 9–504 precludes a finding of successor liability.

Additionally, there is authority, though not substantial, supporting the proposition that, in a proper case, a corporation may be held liable for the debts and liabilities of a corporation whose assets it purchased at a UCC foreclosure sale pursuant to section 9–504. There are cases, like *Enstrom*, where the court discusses the applicability of the exceptions to the facts of the case despite the assets having been purchased at a 9–504 sale. 555 F.2d at 282; *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323 (7th Cir.1990) (permitting successor liability claim to go forward in ERISA context despite alleged successor having purchased assets of alleged predecessor at foreclosure sale); *Normarc Seed Co. v. Derby Feed Co.*, 1992 WL 139775 (Conn.Super.Ct. June 15, 1992) (plaintiff's claim of successor liability on trade debt analyzed under mere continuation elements even though sale of assets occurred via 9–504 sale; court rejected plaintiff's claim because "the management and operating structure has changed completely" and there "was new capitalization with new cash").

There is also some direct authority that supports Glynwed's position. *E.g.*, 19 Am. Jur.2d § 2721 ("There are circumstances in which a new reorganized corporation may be held liable for the debts of its predecessor, even though it had obtained the property of the latter through a foreclosure or judicial sale."); *Fiber–Lite Corp. v. Molded Acoustical Products of Easton, Inc.*, 1994 WL 541395 (E.D.Pa. Sept. 29, 1994) (directly rejecting defendant's contention that it could not be responsible for alleged predecessor's commercial debt because it acquired assets in 9–504 foreclosure sale). The *Fiber–Lite* Court stated as follows:

[F]or us to strictly adhere to the form of the transaction between Easton and the Bank under § 9504 and allow Easton to avoid its obligations on the unsecured debt it incurred while it was known as Indiana would be to ignore the substance of the transaction which placed Easton as the mere continuation of Indiana. As the continuation of Indiana, Easton is liable for

the debts and obligations of Indiana to Fiber–Lite.

*Id.* at *9; *see also Ross Controls, Inc. v. IRS,* 160 B.R. 527 (E.D.Pa.1993) (holding successor corporation liable for tax obligations of debtor on mere continuation theory despite predecessor being in bankruptcy under Chapter 7 and having its assets sold by a third party).

These decisions are consistent with the notion that in successor liability cases the courts should not elevate form over substance. *Polius,* 802 F.2d at 78 ("when the form of the transfer does not accurately portray substance, the courts will not refrain from deciding that the new organization is simply the older one in another guise"); *Philadelphia Elec. Co.,* 762 F.2d at 310 ("It is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent."); *Knapp v. North American Rockwell Corp.,* 506 F.2d 361, 370 (3d Cir.1974) ("In the present day of complex corporate reorganizations and acquisitions, the intrinsic nature of a transaction cannot be ascertained merely from the form in which it is structured. Courts therefore must examine the substance of the transaction to ascertain its purpose and true intent.") (Rosenn, J., concurring).

In short, not only has Danco/Plastock failed to cite any authority for its claim that the purchase of assets at a 9–504 sale *ipso facto* precludes a finding of successor liability; the relevant authorities actually suggest the opposite. Thus, Danco/Plastock's argument fails, and its motion for summary judgment on this ground must also be denied.

### 3. The Exceptions

Glynwed contends that it is entitled to summary judgment based upon the exceptions to the general rule of nonliability discussed above. Danco/Plastock opposes Glynwed's motion on the merits of the exceptions. The Court will now consider the applicability of the exceptions.

#### a. Implied Assumption of Debts

■ Glynwed's moving brief argued that because Danco/Plastock paid certain debts of Plastimatic and Danco, Danco/Plastock impliedly assumed the debt owed to Glynwed.

Danco/Plastock's opposing brief conceded that Danco/Plastock paid those debts of Plastimatic and Danco necessary for Danco/Plastock to carry on its business, but pointed out that "[v]oluntarily paying certain debts of Plastimatic or Danco is in no respect a wholesale assumption of the liabilities of those corporations. Glynwed cannot and does to point to any legal theory that says otherwise." Danco/Plastock Opp. Br. at 12. Glynwed's reply brief does not address this argument.

Danco/Plastock's argument is persuasive. Assumption of obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business is, as will be discussed, one of the four elements necessary to show de facto merger/mere continuation. *E.g., Philadelphia Elec. Co.,* 762 F.2d at 310. If, as Glynwed contends, this showing established implied assumption of all debts, plaintiffs would never need to show any more than this one element to establish corporate successor liability. This is not the law. *E.g.,* Fletcher, § 7124 ("the mere fact that the new corporation has voluntarily paid some of the debts of the old corporation is no ground for inferring that it assumed the latter's debts"). Thus, Glynwed's motion must be denied.

#### b. Mere Continuation/De Facto Consolidation

Glynwed argues the mere continuation and de facto consolidation exceptions together as one exception, Glynwed Supp.Br. at 27–35, and many courts have also considered them as one exception. *E.g., Luxliner,* 13 F.3d at 73 ("Much the same evidence is relevant to each determination.") (citations omitted); *Lumbard,* 621 F.Supp. at 1535 (de facto consolidation and mere continuation theories "tend to overlap" and " 'no criteria can be identified that distinguish them in any useful manner' ") (citation and footnote omitted).

■ In determining whether a particular transaction amounts to a de facto consolidation or mere continuation, most courts consider four factors: (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and

legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders. *Philadelphia Elec. Co.*, 762 F.2d at 310 (Pennsylvania law) (citations omitted); *Lumbard*, 621 F.Supp. at 1535 (New York law) (citations omitted); *Menacho*, 420 F.Supp. at 133 (New Jersey law) (quoting *McKee v. Harris–Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98 (Law Div.1970), *aff'd*, 118 N.J.Super. 480, 288 A.2d 585 (1972)); Fletcher, § 7165.5; *see also Luxliner*, 13 F.3d at 73 ("In determining whether either of these exceptions applies, the factfinder must consider whether stock was part of the purchase price for the assets; whether there was a continuity of business, control or management between the two corporations; and whether the alleged successor corporation assumed the debts of the predecessor corporation.") (New Jersey law) (citations omitted); *National Grange*, 1994 WL 547747, at *4 (" 'Factors relevant to the "mere continuation" exception include continuity of ownership; continuity of management; continuity of personnel; continuity of physical location, assets and general business operations; and cessation of the prior business shortly after the new entity was formed.' ") (Connecticut law) (quoting *Bowen Engineering v. Estate of Reeve*, 799 F.Supp. 467, 487–88 (D.N.J.1992)).

"Not all of these factors need be present for a de facto merger or continuation to have occurred." *Luxliner*, 13 F.3d at 73 (citing *Good v. Lackawanna Leather Co.*, 96 N.J.Super. 439, 452, 233 A.2d 201 (1967)); *see also Menacho*, 420 F.Supp. at 133 (same). Rather, "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.' " *Id.* (citation omitted).

The first element—continuity of management, personnel, physical location, assets, and general business operations—is clearly met in this case. The undisputed facts reveal that following the sale, (i) Danco/Plastock's management was the same as at Danco and Plastimatic, with exactly the same general manager and sales manager;

(ii) there was substantial continuity among the officers and directors, with Strautnieks continuing as Chairman, Hartley continuing as President, and Rose moving from Chairman to Vice President/Assistant Secretary; (iii) all ninety of Plastimatic's and Danco's employees were employed by Danco/Plastock after the sale; (iv) Danco/Plastock continued to operate out of the same location as Danco and Plastimatic, and used the same telephone number; (v) Danco/Plastock utilized the same equipment and manufactured the same products made by Danco and Plastimatic; and (vi) Danco/Plastock took over the customer base of Danco and Plastimatic and fulfilled orders that had been placed with Danco and Plastimatic prior to the sale.

The second element—a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible—is also met here. Plastimatic applied to withdraw its corporate status in Connecticut on January 22, 1991, following its consolidation with Danco, and over a year before the sale. Danco dissolved its corporate charter on October 21, 1992, four months and nine days after the sale.

The third element—assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor—is met in this case. Indeed, Danco/Plastock concedes this point in its brief: "Certain suppliers refused to sell Danco/Plastock the raw materials necessary for Danco/Plastock to manufacture its products unless Danco/Plastock paid them for supplies that they had sold to Plastimatic and Danco," and Danco/Plastock therefore "voluntarily paid some suppliers that were owed money by the prior owners of the assets." Danco/Plastock Br. in Opp. at 12; *see also* Glynwed Br. in Support at 34–35 (detailing various admissions of Danco/Plastock officers and directors regarding debts of Plastimatic and Danco that Danco/Plastock paid in order to carry on their business, which totalled nearly one-half million dollars).

The fourth and final element—continuity of ownership/shareholders—is also met in this case. It is undisputed that Messrs. Rose, Strautnieks, and Hartley collectively owned (i) 35.1% of Rostra Danco (which

owned 100% of Danco) and, with the exception of Goulette, were the only individual shareholders; and (ii) 32% of Plastimatic and, with the exceptions of Raymond Ford and Joseph Formica, were the only individual shareholders. It is further undisputed that the shareholders of Danco/Plastock are Messrs. Rose, Strautnieks, Hartley, and John Lloyd. Continuity of ownership, not uniformity, is the test, *Lumbard,* 621 F.Supp. at 1535, and the Court finds that on these facts there is continuity of ownership.

The Court recognizes (although defendant's briefs fail to raise the issue) that there is Pennsylvania authority that holds that a de facto merger or consolidation cannot exist unless the shareholders of the predecessor become shareholders of the successor through the successor's use of stock in payment for the predecessor's assets. *E.g., Tracey v. Winchester Repeating Arms Co.,* 745 F.Supp. 1099, 1109–10 (E.D.Pa.1990). This is a minority view, *see* Fletcher, §§ 7124.10, 7124.20, and there is no such requirement under New Jersey law. *E.g., Luxliner,* 13 F.3d at 73 (whether stock was part of the purchase price for the assets is only one factor to be considered); *Bowen,* 799 F.Supp. at 488 ("the proponent of successor liability need not necessarily establish all of the[ ] factors"). Indeed, some courts have held that even the continuity of ownership element itself is not a prerequisite to finding successor liability, *e.g., Diaz v. South Bend Lathe Inc.,* 707 F.Supp. 97, 101 (E.D.N.Y. 1989); the Court does not need to reach that question here, however, because there is, despite the presence of cash in the purchase of the assets, continuity of shareholders in this case. Moreover, Pennsylvania courts do not appear to require this showing in the continuation context, and one federal district court, applying Pennsylvania law, has recently held a successor liable on a mere continuation theory despite the presence of cash in the purchase of the assets. *Fiber–Lite,* 1994 WL 541395 ("we must be careful not to elevate form over substance") (citations omitted).

Not only does the Court find that the elements of the consolidation and continuation theories have been met, but the Court is also convinced, under what the Third Circuit has recently described as the "crucial inquiry" in this context, that "there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Luxliner,* 13 F.3d at 73 (citation omitted). For example, in their Investment Memorandum regarding the proposed sale of assets, Plastimatic and Danco, under the name "Danco/Plastimatic," described the proposed sale as follows:

> In order to complete the Danco acquisition in a timely manner and to begin to reap some of the benefits of consolidation, the Danco transaction was accomplished by keeping each of the two companies['] respective banking relationships in place. This has resulted in a situation where both companies [Plastimatic and Danco] are operating under one roof and one management team but where, from an accounting and legal standpoint, the two companies and their assets and liabilities have to be kept separate.

> While the company has been trying for over a year to consolidate the banking arrangements and, thereafter, the books and records, only recently have the two lenders created the opportunity that permits such a transaction.

> .      .      .      .      .

> As Danco/Plastimatic is not in the financial position to meet both banks['] demands by finding a new financing source to repay their loans, the company was left with no alternative other than to organize a complete restructuring of the two companies. This restructuring will take the form of a "secured party sale".

Investment Memorandum, annexed to Certif. of Gina G. Milestone, Esq., at Exhibit 11. This characterization of the sale by "Danco/Plastimatic" shows that the parties considered themselves to in fact be consolidating the companies, not merely selling their assets. Thus, Danco/Plastock held itself out to the world "'as the effective continuation of the seller.'" *Bowen,* 799 F.Supp. at 488 (citation omitted). For these reasons, the Court holds that Danco/Plastock is the corporate successor of Plastimatic and Danco.

### c. *Fraudulent Conveyance*

Glynwed argues that the 9–504 sale was fraudulent in violation of New Jersey's Uniform Fraudulent Transfer Act, N.J.S.A. 25:2–20 et seq., and that the sale was not in good faith or commercially reasonable. The Court finds that Glynwed has failed to carry its summary judgment burden regarding its argument that the sale was commercially unreasonable and in bad faith. Glynwed simply has not adduced facts entitling it to judgment as a matter of law. The same holds true for Glynwed's fraudulent transfer argument. Thus, Glynwed's motion for summary judgment on these grounds must be denied.

### III. *CONCLUSION*

Based upon the foregoing, plaintiff Glynwed's motion for summary judgment is granted in part and denied in part, and defendant Danco/Plastock's motion for summary judgment is denied. Specifically, Glynwed's motion for summary judgment on the issue of successor liability is granted with respect to the de facto consolidation/mere continuation theory; Glynwed's motion for summary judgment on all other theories of successor liability is denied. Danco/Plastock's cross-motion for summary judgment on the theory that UCC section 9–504 precludes a finding of successor liability for the commercial debt of an alleged predecessor corporation is denied.